Pott, J.,
delivered the opinion of the court:
This is an action brought by a patentee to recover his royalty upon certain cartridge-boxes covered by his letters patent, which were manufactured by the defendants’ Ordnance Department., under an implied license from the jiatentee.
The learned counsel for the defendants resists a recovery upon the ground that letters x>atent do not exclude the government from the free use of a patented invention. He cites, to sustain the proposition, the English cases of Feather v. The Queen (6 B. & S., Q. B., 237) and Dixon v. The London Small Arms Company (10 Law Rep., Q; B., 130, 1874 —’75; 1 Law Rep., Q. B. Div., 384, 1875-’76; 1 Law Pep. ax>peal cases, 632., 1875-’76), and it may be conceded that such is the law of England. The resulting question is wdiether that is likewise the law of this country.
Invention in the useful arts seems to have been i>eculiarly a product of the Anglo-Saxon mind. But the common law, which, dealt with things tangible and material, did not recognize prop *418 -erty in the mind-work of the inventor, and no English statute attached the legal quality of a right to an invention or created .ia remedy for the protection of the inventor. If the court of 'chancery had existed with anything like its modern jurisdiction, it is probable that inventors would have gone there for xelief, and that their devices would have been protected upon the same principle that courts of equity have since maintained a person’s right to his trade-mark; but there being neither a xemedy at law nor relief in equity, inventors naturally sought the only approximation to redress that was within their reach, viz, the protection afforded by a royal patent. The first known instance of this, according to Ooryton (Ooryton Patents, p. 4, note), was the case in the reign of Edward III, where a patent was issued for the invention of the pliilosoiiher’s stone, which is cited by Sir F. Moore in his report of the Case of Monopolies (Moore, 675). The invention we now regard as a superstition, 'but the application was referred by the King to a commission, which reported favorably upon it, and the patent issued apparently upon what we now regard as sound doctrine, that the invention ivas ncw and useful. The right to create general monopolies by means of royal patents was universally regarded during the Middle Ages as an attribute of sovereignty, and thus inventions came to be first mingled and ultimately classed with monopolies.
During’ the reign of Elizabeth it was the policy of the Crown to raise as little revenue as possible by direct taxation, and as much as possible by the sale of monopolies. In the forty-fourth year of her reign, the burdens borne by the nation through this method of indirect taxation had become so intolerable that they produced an outbreak in Parliament; and the extraordinary extent to which the system had been carried is nowhere so well stated as in the report of the debate on the bill entitled “An act for the explanation of the common law in certain eases of letters patents,” moved b3 Mr. Lawrence Hyde on the 20th November, 1601, a debate in which both Sir Walter Raleigh and “Mr. Francis Bacon” participated.
Sir Robert Wroth said: “There have been divers patents .granted since the last Parliament; these are now in being, viz: the patents for currants, iron, powder, cards, ox shin-bones, train -oyl, transportation of leather, lists of cloth, ashes, anise-seed, *419 vinegar, sea-coals, steel, aquavitse, brushes, pots, salt-peter, lead, accidences, oyl calumet stone, oyl of blubber, fumathos or dried piltchers in tbe smoak, and divers others.” * * * u Upon tbe reading of tbe patents aforesaid, Mr. Hackwell, of Lincoln’s Inn, stood up and asked thus: Ms not bread there?’ ‘Bread,’ quoth one. ‘Bread,’quoth another. ‘ This voice seems strange,’ quoth another. ‘ This voice seems strange,’ quoth a third. ‘ No,’ quoth Mr. Hackwell, ‘if order be not taken for these, bread will be there before the next Parliament.’ ” And Sir Edward Hobbie “informed the House of the great abuse of the patentee for salt in his country”; that “where salt (before the patent) was wont to be sold for sixteen pence a bushel, it is now sold for fourteen or fifteen shillings a bushel.” And Mr. Spicer Burgess, of Warwick, most accurately defined a monojmly to be a restraint of anything public in a city or commonwealth to a private use.” (Sir Simonds D’Ewes’ Journals of Parliament.)
On a subsequent day, the Queen being pleased, in the language of the speaker of the house of commons, “to lay the axe of her princely justice at the root of the tree,” signified, through him, to Parliament that some of the obnoxious patents “ should be presently repealed, some suspended, and none put in execution but such as should first have trial according to the law for the good of the people.” And in consequence of this assurance the bill “for the explanation of the common law in certain cases of letters patents” was laid aside.
But in the following year, 1002, there came before Chief Justice Popham and all the judges what has ever since been known as the great Case of Monopolies, D’Arcy v. Allen (Moore, 671; Noy, 179; 11 Co., 86), in which the distinction is clearly taken between patents “where any man by his own charge and industry or by his own wit and invention doth bring any new trade into the realm, or any engine tending to the furtherance of a trade that never was used before,” and patents to create a monopoty of things public and restrain them to a private use. And in 1623 (the abuse of patents having been revived) there was enacted the Act concerning Monopolies (21 Jac., I, cap. 3).
This celebrated statute continued to define the law of England concerning patent rights for inventions when the decisions in Feather v. The Queen and Dixon v. The London Small Arms Compcmy (supra) were rendered. It prohibits almost every conceivable form of monopoly, but declares two notable exceptions: *420 1st, that its restrictions “shall not extend to any letters patent or grants of privilege heretofore made or hereafter to be made of, for, or concerning printing ”; which I take to be the statutory germ of our modern law of copyright; 2d, by providing that its restrictions (§§ 5, C) “shall not extend to any letters patent and grants of privilege of the sole working or making of any manner of new manufactures within this realm to the true and first inventor and inventors.” But it neither recognizes an invention as property nor declares the right of a true and first inventor to acquire a patent. In a word, it left the law concerning inventions substantially as it was declared to be by the decision in the Case of Monopolies, neither adding anything to the rights of the inventor nor taking away his existing privilege of receiving a grant or patent from the Crown. Therefore it is as historically clear as it is authoritatively settled by the decisions of the English courts that a patent in England was nothing more than • a grant dependent in contemplation of law upon royal favor, and subject to the general implication of all grants wherein the contrary was not expressed, that they shall not exclude a user by the Grown.
In this country, on-the contrary, our organic law recognizes in the clearest terms that mind-workwhichwe term inventions. What immediate reasons operated upon the framers of the Constitution seem to be unknown, but it is plain that they had a (dear apprehension of the English law, on the one hand, and a just conception, on the other, of what one of the commentators on the Constitution has termed “a natural right to the fruits of mental labor.” Instead of placing our patent system upon the English foundation of executive favor and conferring that prerogative of the Crown upon the President, they transferred all authority to the legislative department of the government (the department which regulates rights), by placing it among the specially enumerated powers of Congress.
It is a noticeable fact, which, however, seems to have received very little attention, that neither the word “patent” nor the word “grant” is used in the Constitution. (Art. 1, § 8.) The words which it docs employ, moreover, are unmistakably clear in the intent of its recognition. The language of the English law is, in substance, that the Crown may grant or confer upon the inventor a patent, subject to the conditions and limitations which attach by implication to grants from the Crown. The *421 language of the Constitution, on the contrary, confers upon Congress the power of “ securing ” “ to inventors the exclusive right to their” “discoveries.” Congress are not empowered to grant to inventors a favor, but to secure to them a right. And the term “to secure a right” by no possible implication carries with it the opposite power of destining the right in whole or in part by appropriating it to the purposes of government without complying with that other condition of the Constitution, the making of “just compensation.” Neither does the term “ the exclusive right” admit of an implication that with regard to such patentable articles as the government may need the right shall not be exclusive. The transfer of the power from the executive to the legislature; the abandonment of the terms “grant” and “'patent”; the substitution of the words “secure,” “right,” and “ exclusive ”; the absence of an express reservation which at common law attaches to favors of the Crown or is inferable from the terms “grant” and “patent,” are facts which combine to demonstrate that the framers of the Constitution designed to place the work of the inventor among legal rights, which, when properly “secured” in a manner to be provided by law, should become property in the eye of the law and be respected as such by the government as by the citizen.
Pursuant to the plain intent of the Constitution, Congress have never sought to attach such a condition to the issuing of a patent; private acts have been passed remitting claims for the use of patented inventions to this court for adjudication; statutes have been enacted prohibiting or regulating the use of patented articles in the government service (12 Stat. L., 91,104, § 3; Rev. Stat., § 1537); appropriations have been made to pay inventors the royalty justly due for their property thus taken for public use; the executive departments have freely resorted to patented articles for the purposes of the government, and have made them the subject of express contracts. The course of the legislature and the practice of the executive alike forbid the assumption that this government has ever sought to appropriate the property of the inventor, or that it has ever asserted an inherent right to do so analogous to that reserved in Great Britain by the Crown.
The decisions of the judiciary, so far as they have gone, also seem to be in harmony with the action of the other departments of the government.
*422 In McClurg v. Kingsland (1 How., 202), the Supreme Court held that the repeal of a patent law could liave “no effect to impair the right of property then existing in a patentee,” and that “a patent must, therefore, stand as if the acts [repealed] remained in force.” In Burns’ Case (12 Wall., 246) it was held that the inventor’s license to the government to use his patented invention was a valid consideration to support an action . on an express contract for the royalty. > In Cammeyer v. Newton (94 U. S., 225), in delivering the opinion of the court, Mr. justice Clifford says, “ The rule of law is well settled that an invention so secured is property in the holder of the patent; and that as such the right of the holder is as much entitled to protection as any other property, during the term for which the franchise or the exclusive right or privilege is granted.” And alluding to the previous decision in Burns’ Case, he adds (p. 234): “Agents of the public have no more right to take such private property than other individuals under that provision [Patent Act 1870, 16 Stat. L., 198, § 22], as it contains no exception warranting any such invasion of the private rights of individuals. Conclusive support to that proposition is found in a recent decision of this court, in which it is held that the government cannot after the patent is issued make use of the improvement any more than a private individual, without license of the inventor or making him compensation.”
The counsel for the defendants also insists that the action of the government in resorting to the claimant’s invention was either a tort or a user under a gratuitous license from him. We are unable to adopt either of these extreme views. When a vendible article, such as ordinarily is the subject of bargain and sale, is offered by a producer to a consumer, though with no price specified, and is accepted and used by the latter, it is not to be supposed, on the one hand, that the offer was intended as a gift inter vivos, nor implied, on the other, that the taking was with a tortious intent. In this case the Secretary of War had convened one of those military boards for the selection of arms and ordnance before which inventors and manufacturers are accustomed to appear and present their devices or manufactures with a view to an ultimate sale. The claimant transmitted to the proper and responsible officer of the defendants, their Chief of Ordnance, two specimens of his invention, accompanied by a letter, in which he expressly described them as his *423 “patentcai-tridge-boxes.” Tlie Chief of Ordnance acknowledged: tbeir receipt, using the same term, “your patent cartridge-boxes.” He then transmitted the boxes and the letter to the board, likewise designating the claimant as the inventor.” The board recommended for adoption “ the cartridge-box invented ” by the claimant. The Secretay of War, with the advice of the General of the Army, approved the report of the board; and the Ordnance Department immediately, and without further communication with the claimant, proceeded to manufacture cartridg’eboxes after his design. When the matter indirectly came to.his hearing, the claimant wrote to' the Chief of Ordnance for information, saying that it was a matter of interest to him-.. The Chief of Ordnance replied in the affirmative, adding “but,, owing to the meager appropriations made by Congress, it is not likely that the boxes will be made in any quanties for use in the held for some time to come.” The claimant replied, expressing his thanks, and tlie manufacture continued. If the Quartermaster-General had appointed a board to select a wood-lot for the fuel of the army, and a farmer had written to him recommending his wood, and the board had reported in favor of itf and the Quartermaster Department had proceeded to cut and use the wood, can it be supposed that this would be deemed a tortious taking on the part of the Quartermaster-General or a-gratuitous license on the part of the farmer? Yet this is a mere paraphrase of the facts in this case. The claimant had gone to the expense of turning his invention into property; it Avas an article salable almost exclusively to the gwernment; his offer imported a desire to sell to almost the only purchaser of such, articles; the defendants’ officers considered and acted upon his offer, and adopted and used Ms design. If they proceeded and he allowed them to proceed without the formality of an express license or the precaution of an express consideration, the omission did not change the character of the transaction, for the law supplies by implication a price in giviug what the license was reasonably worth.
The counsel for the defendants has also argued that this court is without jurisdiction of an action upon a patent right except, in the limited class of cases where jurisdiction may be entertained by State courts, because the law has placed the jurisdietion elsewhere.
The answer to this proposition seems to be that an exclusive *424 jurisdiction of all cases against tbe government upon contract, express or implied, lias been given to tbis court, and that a claimant is absolutely without redress in the circuit courts. It is true that in Nicoll & Co.’s Case (7 Wall., 122) the Supreme ■Court held that this court was without jurisdiction, because a remedy given by statute against collectors of customs in the circuit courts was exclusive; but that decision went upon the ground that the law had established an exclusive system for the refund of taxes and had given the claimant a remedy which he might have pursued. So in the case of Be Bode v. Regina (3 Clarke, H. L. Cases, 468) the House of Lords held that the action would not lie against the Crown under a petition of right to recover a certain fund, because the act of Parliament which created the fund “ meant to provide for the application of the whole fund and leave no part to be dealt with except under its enactments. Any claimant, therefore, upon the fund,” the court says, “ must proceed according to the provisions of the statute, and has no other remedy.” So, too, of the abandoned and captured property cases, the Supreme Court has held that the statutory right being expressly coupled with a specific remedy of which the claimant might have availed himself, the remedy was exclusive. (Haycraft’s Case, 22 Wall., 81.)
But all of these decisions go upon the express ground that the party has a remedy elsewhere. In the present case the claimant has confessedly no remedy in the circuit court against the government, and is without a remedy to recover for his property taken for public use, unless the act creating this court gives him one. That act was passed long after the establishment of the patent system; it' is comprehensive in terms; it makes no exception either as regards the kind of property which maybe the subject of an implied contract or as regards the jurisdiction of other courts over suits between ordinary litigants. Where, as in this case, there is clearly an implied contract between the government and the citizen, and the suit is brought entirely upon that agreement, and the claimant is without judicial redress elsewhere, we perceive no reason why we should en-graft an exception upon the statute which Congress have not placed there.
Concluding that the claimant is entitled to recover upon an implied contract for the use of his invention, we now come to the question of damages.
*425 The rule which the court adopts as the measure of these damages is the fair and reasonable valué of a license to manufacture and use under the claimant’s patent, being such a royalty as it may reasonably be presumed the defendants would have been willing to pay and the claimant to accept if the matter at the outset had gone to an express agreement. But while the rule is simple, and one with which no person would probably quarrel, the elements by which we are to estimate these damages are, from the necessities of the case, so meager as to have caused the court considerable embarrassment, and to have occasioned doubts in the minds of some of its members whether the damages can be anything more than nominal. And as to nominal damages, it may be noted the Supreme Court has held that they cannot be recovered against the government in this court. (Grant’s Case, 7 Wall., 331.)
The elements from which the court must estimate damages in this case are simply these: It appears (1) that the manufacturer’s price of the article, apart from royalty, is about $1.25 per box; (2) that 20 per cent, of the manufacturer’s selling price is ordinarily considered by manufacturers and patentees a fair royalty where the patent substantially covers the article sold, but not where it is in part made under two patents and embodies the improvements of two inventors, to each of whom a royalty will be properly due: (3) that in this case the box manufactured by the defendauts was not made exclusively under the claimant’s patent, but involved the right of another inventor, inasmuch as one of the claimant’s improvements was itself an improvement (for reasons hereafter stated) of the improvement of another patentee; (4) that in the judgment of a competent expert, familiar with inventions of this nature and well acquainted with prices paid by manufacturers for licenses, 25 cents a box ivas a fair and reasonable royalty for the right to manufacture and use the article in question, it being assumed, however, by him that the claimant’s patent covered the article exclusively, and that the manufacture did not involve an obligation to another inventor ; (5) that the claimant has not manufactured under his patent, and has sold licenses in but two instances, and then to a very limited extent, and amid circumstances which did not ipso facto raise a presumption that the price charged for the license would be its ordinary market value; (6) that in one of these instances the Arm of Walton Brothers, of New York, being iii *426 ignorance of the claimant’s patent, entered into a contract to supply tlie Marine Corps with 800 cartridge-boxes similar to those manufactured at the defendants’ arsenals, and subsequently, but before delivery, on being informed of the claimant’s patent, paid him the royalty, which he then fixed, of 25 cents a box ; that the firm would have made no profit on the article manufactured by them, and that they deemed the price charged to be a fair royalty for the right to manufacture and sell a patented article of that value, but were ignorant of the fact that the cartridge-box involved the improvement of another patentee; (7) that a similar contract was made with James H. Wilson, of Philadelphia, to supply the Marine Corps with 1,000 cartridge-boxes, he likewise being ignorant of the existence of the claimant’s patent, and likewise paying the same royalty, and in the same belief and for the same reasons.
It is apparent here that the claimant has produced about all the evidence that the nature of his case admits of; and it is to be noted that the defendants have produced no evidence' whatever to controvert it. The claimant perhaps might have produced experts to estimate the value of the other inventor’s original improvement, but the manufactured article has been before us, and it is manifest that the testimony of such witnesses would have been entirely conjectural, and would amount to nothing more than substituting their judgment, from an inspection of the article, for that of the court.
The rate of damages in patent cases may now be said to be generally (1) that the plaintiff may recover in equity the profits which the infringer has made from the use of the invention, or (2) that he may recover at law the profits which he, the plaintiff, has lost by reason of the defendant’s infringement; and that these profits lost, where it can properly be done, will be regarded as simply the fee which would have been charged if the infringer had procured a licence. But in cases where the plaintiff has evinced an intention to exercise an exclusive user of his invention, and in cases where the sales of licenses have been too few to establish a criterion of their actual or market value, courts have sought for other elements or evidences to determine the profits lost. In Suffolk Company v. Hayden (3 Wall., 15) Mr. Justice Nelson said: “ The question of damages under the rule given in the statute is always attended with difficulty and embarrassment both to the court and jury. There being *427 no establisbecl patent or license fee in the case, in order to get at a fair measure of damages, or even an approximation to it, general evidence must necessarily be resorted to. And what evidence could be more appropriate and pertinent than that of the utility and advantage of the invention over the old modes or devices that had been used for working out similar results % With a knowledge of these benefits to the persons who have used the invention and the extent of the use by the infringer, a jury will be in possession of material and controlling facts that may enable them in the exercise of a sound judgment to ascertain the damages, or, in other words, the loss to the patentee or owner, by the piracy instead of the purchase of the use of the invention.” In Cowing v. Rumsey (8 Blatch., 36) Mr. Justice Woodruff said: “ The patentee may sue at law for damages which he has sustained; and those damages he is entitled to recover, whether the defendant has made any profits or not. In such an action it is precisely what is lost to the plaintiff, and not what the defendant has gained, which is the legal measure of the damages to be awarded. Under this rule it may often be entirely proper to prove the profits of the ordinary use of the invention and demand existing in the market, evidenced by sales made, and so, as an element of consideration, show the profits realized by the defendant, in order to furnish to the jury all proper materials for determining how much the plaintiff has lost.” And in Philp v. Nock (17 Wall., 450) Mr. Justice Swayne said, Where the plaintiff has sought his profit in the form of royalty, paid by his licensees, and there are no peculiar circumstances in the case, the amount to be recovered will be regulated by that standard. If that test cannot be applied, he will be entitled to an amount which will compensate him for the injury to which he has been subjected by the piracy.”
It is true that the established price of a license, or the profits lost by the patentee as a manufacturer, are the ordinary criteria for determining his damages in a suit at law; yet, nevertheless, where he has clearly suffered a material loss by the defendants’ use of his invention, and has produced all the evidence which the nature of his case admits of to establish the amount, there has never yet been a case in which his recovery has been restricted to nominal damages. Moreover, if such were the law, it is manifest that an ordinary infringer would occupy a defensive position as strong as that which the government holds in *428 this case. If the firm of Walton Brothers had refused to pay to the claimant his royalty, they might now be saying to another tribunal, “ The patentee cannot recover our profits, for we made none. He cannot recover a license-fee, for he has not established the value of Ms licenses. He cannot recover his own profits as a manufacturer, for he does not manufacture nor seek to manufacture the patented article. He is without legal redress, and we are free to pirate his invention in the same manner, and forestall Mm in the market, until we render his patent practically worthless.” It is not to be supposed that those decisions which hold a patentee to proof of his actual damages were ever intended to be pushed to this extreme result.
Furthermore, if this court now admits this questionable evidence, and gives effect to it after it is admitted, by deducing from it such facts as a jury might deduce, the sufficiency of the evidence to sustain the finding may be made a matter of review in the Supreme Court on a proper statement of the facts. (Pugh’s Case, 99 U. S., 265.) But if this court, with this evidence before it, should refuse to find the damages, it is not perceived how the question could be reviewed ,• for the appellate court can neither deduce facts from the evidence nor instruct this court as to what deduction should be drawn from it. (Childs, Pratt & Fox Case, 7 C. Cls. R., pp. 158, 209, erroneously reported as United States v. Adams, 9 Wall., 661.) In cases where this court exhausted the function of a jury, and found, as it were, a verdict for the plaintiff, the Supreme Court has been enabled to pass upon the legal question whether the evidence ivas sufficient to sustain the judgment. • (C. C. Clark’s Case, 96 U. S., 37; Intermingled Cotton Cases, 92 id., 651; Moore’s Case, 91 id., 270.) But it is not until this court has exhausted the function of a jury that the question of law involved can be presented to the court above for review. In a word, the Supreme Court cannot do the work of a jury, and will not render decisions upon hypothetical cases. If this case were being tried at nisi prius, the court might exclude the evidence and direct a verdict for the defendant, and the error might then be presented to the court above by a bill of exceptions. But circumstanced as this court is, the only means in its possession for presenting such questions to the Supreme Court is to admit the questionable evidence as a decision of law, and then to draw from it whatever deductions of fact the court, sitting as a jury, may think that it establishes. *429 The Supreme Court will then be in a position to say whether the evidence should or should not have been admitted; whether it does or does not sustain the judgment.
We proceed now to state the theory upon which we compute the claimant’s damages.
It is conceded that the cartridge-boxes manufactured by the defendants were made in substantial conformity with the specifications of the claimant’s patent; but the counsel for the defendants has nevertheless brought in three prior patents, all of which he insists are more or less utilized in the manufactured article. In other words, that the gross amount of the royalty, the sum of 25 cents, is due not to the claimant alone but likewise in part to the other throe inventors.
The first of these patents is that issued to William Freeborn, December 10,1867. In it the cartridges are attached to both the front and back of the box. But they are all placed in the box in the same position, that is to say, with the fulminate up. The box is operated by raising a flap, which brings into view the upper tier or doublerow of cartridges. When this tier is emptied, a section of the front of the box, by unbuttoning a strap at eacli end, drops down, thus bringing into view the second tier of cartridges. When the second tier is in like manner exhausted, a second section of the front of the box may be in like manner unbuttoned and dropped, and a third tier be brought into view.
In the claimant’s box there is no flap to be raised. The cartridges attached to the front of the box are placed fulminate down. When the box is opened it divides from top, to bottom like a modern traveling-valise, the front falls down, thereby reversing its cartridges, bringing them fulminate up, and the entire contents of the box, by the single operation of unbuttoning a single button, are brought within the soldier’s reach. We perceive nothing in common between the two boxes, except the mechanical arrangement of attaching the cartridges to both the front and back of the box. The object which Freeborn had in view' was to rfeduce the thickness or clumsiness of the ordinary cartridge-box, and the means by which he attained that end was the successive bringing into view of tiers of cartridges by the process of dropping successive sections of the front of the box. The object which the claimant had in view was to dispense with the flap of the ordinary cartridge-box, and by the single operation of unbuttoning a single strap to bring the en *430 tire contents of the box within the reach of the soldier’s grasp. The mechanical appliances were to some extent the same, but the objects to be attained and the means for obtaining them were substantially different and distinct.
The second patent produced is that issued to J. E. King, November 15, 1870. This invention is not properly a box, but a scroll having cartridges attached to it, much as razors, combs, &c., are attached to a traveling dressing-case, which, when closed, i. e., rolled up, somewhat resembles a box. The peculiarity of it is that at the lower end of the scroll there is a double row of cartridges, the one attached to the outside and the other to the inside of the scroll, the one row with fulminate up, the other with the fulminate down. When the scroll is rolled up so as to form a box, it contains but a single tier of cartridges, which, however, is three deep; that is, contains three rows. The box is operated by raising a flap, by removing the cartridges from the two rows in which the fulminate is up, and then, by unbuttoning two straps and opening the scroll, reversing the third row, and thus bringing the remaining row of cartridges fulminate up. The only thing in common between this device and that of the claimant is that of placing a portion of the cartridges with the fulminate down when the box is closed. But the object of the two inventors and the means of attaining their objects are different and distinct.
The third patent is that issued to T. Chillingworth, June 15, 1869. There is one device in this invention which conflicts with one device in the claimant’s, and it is this: The lower tier of cartridges may be thrown forward, that is to say, inclined outward, so as to come within the more ready grasx> of the soldier. In the Chillingworth invention this is accomplished by a hinge attached to the outer lower edge of the tier, and is operated by unbuttoning a strap below and a strap above, and with the latter drawing the lower tier over. In the claimant’s invention it is accomplished by a bellows arrangement, something like that of the musical instrument known as an accordeon, and the device is substantially self-operating, requiring no loosening of straps to incline the tier, and no rebuttoning of them when the box is closed.
We therefore regard Chillingworth as the first inventor of this device, and the claimant’s invention as an improvement upon his. On the one hand, this fact did not authorize the de- *431 leudante to use tbe claimant’s improvement free of compensation ; on tbe other, it precludes tbe claimant from recovering as if be were tbe sole inventor. It is manifest that tbe invention of Cbillingwortb is a trivial element in tbe cartridge-box actually made; but inasmuch as both of tbe parties are subject in this element of tbe box to tbe prior right of Cbillingwortb, and tbe defendants now appear to be liable to him for such damages as be may have sustained, we deduct on account of bis invention tbe sum of 5 cents per box, and allow to tbe claimant 20 cents per box.
Tbe court is not agreed as to tbe extent to which tbe claimant should recover, but a majority of tbe judges, for tbe purpose of intelligibly presenting tbe entire case to tbe Supreme Court, concur in tbe following judgment:
That tbe claimant recover a license-fee of 20 cents a box on tbe 18,813 cartridge-boxes manufactured by tbe defendants, amounting in tbe aggregate to tbe sunvbf $3,762.60.