330 F.2d 622
 Bert N. ADAMS, Emma Adams, George Hallingby (individually and as Executor of the Estate of Olaf Hallingby, deceased), Jane Maesel, Iris Petry, Lewis M. Schott, Mary Ellen Hallingby Seimers, and Helen Louise Sutcliffe (individually and as Executrix of the Estate of Ernest M. Sutcliffe, deceased)
v.
The UNITED STATES.
 No. 163-60.
 United States Court of Claims.
 April 17, 1964.
 
 John A. Reilly, New York City, for plaintiffs. Richard A. Huettner, William J. Ungvarsky and Kenyon & Kenyon, New York City, were on the brief.
 Paul F. Arseneau, Atty., Dept. of Justice, with whom was Asst. Atty. Gen. John W. Douglas, for defendant.
 Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE, and DAVIS, Judges.
 PER CURIAM.
 
 
 1
 This case was referred to Trial Commissioner Donald E. Lane, pursuant to Rule 45(a),[1] to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report filed January 28, 1963. Both plaintiffs and defendant have filed exceptions to the commissioner's report and briefs in support thereof.
 
 
 2
 The case was submitted to the court, on oral argument of counsel, on the issue of liability. The court agrees with, and adopts, the findings and recommendation of the commissioner, with a slight modification,[2] as the basis for its judgment in the case. Plaintiffs' patent is valid and the invention covered therein was used by defendant without authorization. Plaintiffs are entitled to recover reasonable and entire compensation for such unauthorized use, and judgment will be entered to that effect. The extent of liability will be determined in further proceedings before a trial commissioner, pursuant to Rule 47(c) (2).
 
 OPINION OF COMMISSIONER
 
 3
 This is a claim for compensation under 28 U.S.C. § 1498, for unlicensed use of a patented invention, for compensation under 28 U.S.C. § 1491 for breach of implied contract, and for compensation under the Mutual Security Acts of 1951 and 1954, 22 U.S.C. §§ 1668 (repealed in 1954) and 1758, respectively.
 
 
 4
 The subject matter concerns an electric battery disclosed in United States Letters Patent 2,322,210, issued June 22, 1943, to Bert N. Adams, one of the petitioners herein. The patent disclosure, patent claims in suit, and the accused batteries used by defendant are described in the accompanying findings of fact. The several issues of law involved are discussed in the following comments.
 
 
 5
 One of the important issues raised by the pleadings is whether the fact that the individual constituents of the Adams battery have been long known in the art and have been used in various combinations in numerous batteries developed in the past, negates the essential element of novelty required in a valid patent, even though the specific combination used by Adams was never before disclosed and produced unusual and unexpected results. The defendant has cited some 24 prior disclosures against the Adams patent. These citations, some of which date back as far as 1880, show that each of the elements of the Adams battery was well known in the battery-making art at least 50 years before the Adams application for letters patent. Adams, after all these many disclosures, put together the specific combination of elements that resulted in a lightweight cell which could be exposed to extreme temperature conditions and which, upon activation by water, produced a constant electric potential. The volume of the prior art points to the novelty of the Adams invention. It has been frequently held that voluminous prior art indicates that none of the prior art is in point or indicates that prior attempts to solve the problem have not met with success. In the case of Reynolds v. Whitin Mach. Works, 167 F.2d 78, at pages 83 and 84 (4th Cir., 1948), it was held:
 
 
 6
 "Defendant has cited 21 patents as basis for its contention that complainants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success."
 
 
 7
 The fact that it was known to one skilled in the battery art that the various individual components of the Adams battery could be used in designing batteries, does not make the Adams invention obvious and unpatentable within the meaning of 35 U.S.C. § 103. The pertinent portion of this section reads as follows:
 
 
 8
 "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."
 
 
 9
 The evidence presented during the trial shows that although the necessary materials and techniques were available to the battery experts for over 50 years, no one put them together, or recognized that the combination would work, or yield new and unexpected results. Further, the evidence shows that the invention constituted an important advance in the art and has had many successful uses. The courts have recognized that obviousness is negated where the patent teaches a solution which has long eluded the researchers in the art, even though all the elements required to provide the solution have been readily available. In Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, at page 279, 64 S.Ct. 593, at page 594, 88 L.Ed. 721 (1944), in supporting the validity of a patent relating to a leakproof dry cell for a flashlight battery, Mr. Justice Roberts, writing for the Supreme Court, said:
 
 
 10
 "Viewed after the event, the means Anthony adopted seem simple and such as should have been obvious to those who worked in the field, but this is not enough to negative invention. During a period of half a century, in which the use of flashlight batteries increased enormously, and the manufacturers of flashlight cells were conscious of the defects in them, no one devised a method of curing such defects. Once the method was discovered it commended itself to the public as evidenced by marked commercial success. These factors were entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability. Accepting, as we do, the findings below, we hold the patent valid and infringed."
 
 
 11
 See also Peerless Equipment Co., v. W. H. Miner, Inc., 93 F.2d 98 (7th Cir., 1937), and Remington Rand Business Service, Inc. v. Acme Card System Co., 71 F.2d 628 (4th Cir., 1934). While the use of any of the individual components of the Adams battery cell may have been obvious at the time of the invention, the invention as a whole was not obvious, at the time the invention was made, to a person having ordinary skill in the art.
 
 
 12
 The fact that the Adams patent discloses only a single embodiment of his invention does not necessarily restrict the claims of his patent to that particular embodiment. The Adams patent discloses that the cuprous chloride electrode is made by heating cuprous chloride until it melts and then forming it into a cylindrical electrode by the use of a mold. The defendant alleges that since the cuprous chloride electrode is referred to in the specification and the claims as fused, the claims must be restricted to the type of electrode described in the specification of the patent. The facts show that the term fused may refer to unifying by means other than by the particular method described in the specification of the Adams patent. The description of an invention in the specification is required by 35 U.S.C. § 112, which reads in part as follows:
 
 
 13
 "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."
 
 
 14
 It is evident that this section does not require an inventor to disclose every possible way in which his invention may be used, nor does it limit the claims of the patent to the particular mode which the inventor considers best at the time of filing his application for patent. In the case of Smith v. Snow, 294 U.S. 1, at page 11, 55 S.Ct. 279, at page 283, 79 L.Ed. 721 (1935), Mr. Justice Stone, in discussing this point, said:
 
 
 15
 "We make take it that, as the statute requires, the specifications just detailed show a way of using the inventor's method, and that he conceived that particular way described was the best one. But he is not confined to that particular mode of use, since the claims of the patent, not its specifications, measure the invention."
 
 
 16
 It is clear that the Adams patent claims are not limited to covering only electrodes made in the specific manner described in the specification.
 
 
 17
 The fact that in some instances silver chloride may be equivalent to cuprous chloride does not entitle the plaintiffs to extend the coverage of the Adams patent claims to cover silver chloride electrodes as well as cuprous chloride electrodes. Neither the specification nor the claims of the Adams patent mention that silver chloride may be used as the electronegative electrode. However, plaintiffs allege that silver chloride and cuprous chloride were well known electrochemical equivalents prior to the Adams invention, and that cells made with silver chloride electrodes also infringe the claims of the patent. The doctrine of equivalents is based on the theory that one should not be able to avoid infringement of a patent merely by substituting an equivalent for one of the elements recited in a claim. The doctrine is invoked when a person reasonably skilled in the art would have known of the interchangeability of an ingredient not disclosed in the patent with one that was. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). It cannot be said that one reasonably skilled in the battery art would have known of the interchangeability of cuprous chloride and silver chloride in the Adams battery. The battery disclosed in the Adams patent is made up of particular components which unexpectedly produced a battery having unique characteristics. The Adams patent specification is completely silent as to any other components which would work equally well in his battery. The public was left to mere speculation or experimentation to determine whether in all the known battery components there was any other component which could be used in place of the particular components which Adams disclosed. In considering equivalency, the context of the patent, the prior art, and the particular circumstances of the case must also be weighed. In the present case, the validity of the Adams patent is sustained on the ground that, in a crowded art, Adams selected specific components from the group of known battery components and found that the combination of these specific components resulted in a workable battery having unique and unexpected characteristics. The unexpectedness of the Adams invention is evidenced by the fact that, even today, the theory upon which the Adams battery operates is unknown. To allow the plaintiffs to expand the Adams patent claims to include other allegedly equivalent components, which were also in the known group of battery components at the time of the Adams invention, would be contrary to the finding of validity. It was stated in Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., 196 F.2d 103, 112, (7th Cir., 1952), that:
 
 
 18
 "In our opinion, the application of the doctrine of equivalency in this case is to ignore the teachings of the patent, the representation upon which the claims in suit were allowed and, more pointedly perhaps, the representations by which their validity has been sustained in the courts. While the difference between plaintiff's composition and those accused may not be great, it is that difference which distinguished plaintiff's composition from the prior art and which enabled it to sustain the validity of its grant. It is now estopped from claiming otherwise."
 
 
 19
 Claims 1 and 10 of the Adams patent have been specifically relied upon by the plaintiffs. These two patent claims, set forth in finding 12, each define a combination including a magnesium electropositive electrode and a fused cuprous chloride electronegative electrode. Claim 10 also recites the presence of a carbon catalytic agent in the electronegative electrode. The accused Eagle-Picher and Ray-O-Vac battery units identified in findings 25 and 26 as trial exhibits 7, 8, and 9, each include a magnesium electropositive electrode and a fused cuprous chloride electronegative electrode as set forth in more detail in finding 34. These batteries infringe claim 1 of the Adams patent. The accused Burgess battery unit identified in findings 28 and 37 as trial exhibit 18 contains a silver chloride electronegative electrode and does not infringe the claims of the Adams patent.
 
 
 20
 Summarizing, it is found that plaintiffs are the rightful owners of the Adams patent, that the patent is valid, that the invention claimed therein has been used by defendant without license of the owners, that the plaintiffs are entitled to recover compensation for such use, and that the extent of liability should be determined in further proceedings pursuant to Rule 47(c) (2).
 
 FINDINGS OF FACT
 
 21
 1. This is a suit involving a patent claim and a contract claim brought under the provisions of 28 U.S.C. §§ 1491 and 1498 and 22 U.S.C. §§ 1668 (repealed) and 1758. The parties have stipulated that this court has jurisdiction over all of the parties involved and over the issues raised by the petition and answer.
 
 
 22
 2. The patent claim is for reasonable and entire compensation for unauthorized and infringing use or manufacture by or for defendant, and for the unauthorized and infringing use within the United States in furtherance of the purposes of the Mutual Security Acts of 1951 and 1954 of United States Letters Patent No. 2,322,210 entitled "Battery" which issued June 22, 1943, on an application for patent filed by Bert N. Adams, a plaintiff herein. This patent will be referred to hereinafter as the Adams patent.
 
 
 23
 3. The breach of contract claim is for reasonable and entire compensation for defendant's breach of an express or implied contract existing between defendant and plaintiffs relating to compensation for use or manufacture by or for defendant of batteries made in accordance with disclosures made to defendant by plaintiff Bert N. Adams.
 
 
 24
 4. At pretrial conference, the parties stipulated that upon proof of the manufacture by or for, or the use by or for, the defendant, of one or more articles alleged in the petition, or otherwise alleged on the record, to infringe the Adams patent, the issues of patent validity and of infringement of the patent by the defendant would be first determined upon full proofs, findings of fact, and argument of counsel. The parties further agreed that the accounting issue, including evidence as to the number of articles procured and/or the value of the patented invention, or the extent of the liability, if any, of the defendant, and the amount of reasonable and entire compensation, if any, due to plaintiffs on account thereof, would be deferred until after the entry of the order of the court on the issues of patent validity and/or patent infringement.
 
 
 25
 5. The ownership of the Adams patent, the application therefor, and the claims against the defendant involved in this suit are as follows:
 
 
 26
 a. The application for patent was filed December 18, 1941, and from that date through January 14, 1942, ownership of the application and any claims arising during this period was: 10 percent in Olaf Hallingby (owned until July 16, 1959, by his heirs, Mary Seimers, George Hallingby, Iris Petry, and Jane Maesel), and 90 percent in Bert N. Adams.
 
 
 27
 b. From January 15, 1942, through January 16, 1942, ownership of the application and the claims arising during this period was: 10 percent in Olaf Hallingby (owned until July 16, 1959, by his heirs, Mary Seimers, George Hallingby, Iris Petry, and Jane Maesel); 45 percent in Bert N. Adams, and 45 percent in Emma Adams.
 
 
 28
 c. From January 17, 1942, through September 14, 1942, ownership of the application and the patent (which issued on June 22, 1942) and the claims arising during this period was: 10 percent in Olaf Hallingby (owned until July 16, 1959, by his heirs, Mary Seimers, George Hallingby, Iris Petry and Jane Maesel); 45 percent in Emma Adams; 1.35 percent in Ernest Sutcliffe (owned by his heir, Helen Sutcliffe, until July 16, 1959), and 43.65 percent in Bert N. Adams.
 
 
 29
 d. From September 14, 1942, through April 14, 1959, ownership of the application and the patent and the claims arising during this period was: 10 percent in Olaf Hallingby (owned until July 16, 1959, by his heirs, Mary Seimers, George Hallingby, Iris Petry, and Jane Maesel); 45 percent in Emma Adams; 0.9 percent in Ernest Sutcliffe (owned by his heir, Helen Sutcliffe, until July 16, 1959), and 44.1 percent in Bert N. Adams.
 
 
 30
 e. From April 15, 1959, through July 15, 1959, ownership of the patent and the claims arising during this period was 10 percent in Olaf Hallingby (owned until July 16, 1959, by his heirs, Mary Seimers, George Hallingby, Iris Petry, and Jane Maesel); 0.9 percent in Ernest Sutcliffe (owned until July 16, 1959, by his heir, Helen Sutcliffe), and 89.1 percent in Bert N. Adams.
 
 
 31
 f. From July 16, 1959, through August 30, 1959, ownership of the patent and the claims arising during this period was 100 percent in Bert N. Adams.
 
 
 32
 g. After August 31, 1959, ownership of the patent (which expired June 21, 1960) and the claims arising during this period was 100 percent in plaintiff Lewis M. Schott.
 
 
 33
 6. Adams first became interested in batteries in the summer of 1939. While employed at the New York World's Fair, he studied various battery theories at home, and conducted experiments using various types of electrodes and electrolytes in batteries. Finally, Adams discovered that when cuprous chloride was used in combination with magnesium and water, the result was an operable battery.
 
 
 34
 7. Adams continued experimenting, and in 1940, after accidentally dropping cigarette ashes into the cuprous chloride which he was making into a cathode, he discovered that the addition of carbon improved the battery by increasing the current and providing a substantially level (constant) potential. Subsequent experiments taught Adams that a small addition of magnesium chloride to the electrolyte would increase the speed of activation of the battery and that the addition of a small amount of magnesium sulphate helped to clean the electrodes.
 
 
 35
 8. On December 18, 1941, Adams filed an application for patent in the United States Patent Office. This application resulted in the issuance of the Adams patent on June 22, 1943.
 
 
 36
 9. The Adams patent disclosed a battery comprised of a magnesium electropositive electrode (anode), a cuprous chloride electronegative electrode (cathode), and a water electrolyte. The distinctive characteristics of this battery are that it is light in weight, it uses ordinary water as an electrolyte, it may be manufactured and distributed in a dry condition and may be rendered serviceable by merely filling the container with ordinary water, it may be operated under extremely cold conditions, and, upon complete activation, it produces a linear (constant) potential which continues until the battery is substantially exhausted.
 
 
 37
 10. The Adams patent contains several illustrative drawings which are reproduced below.
 
 
 38
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE 11. The specification of the Adams patent describes the drawings in part as follows:
 
 
 39
 Figure 1 is a sectional view of a battery in accordance with my invention;
 
 Figure 2 is a top plan view; and
 
 40
 Figure 3 is a sectional view taken along the line 3 — 3 of Figure 1.
 
 
 41
 In the embodiment selected for illustration, I make use of a container 10 provided with a closure or cover 12 of insulative material. The container 10 may comprise glass or any other material which is waterproof. Inside the container 10 is arranged an electro-positive electrode 14 comprising pure magnesium. The electro-positive electrode 14 is in the form of an open ended tube of a length slightly less than the height of the container 10. Projecting upwardly from the bottom 16 of the container are notched ears 18 in which the lower end of the electropositive electrode 14 is supported. An extension 20 is provided at the upper end of the electropositive electrode 14, which extension projects through an opening 22 in the cover 12 to constitute one terminal of the battery. The outer surface of the electropositive electrode 14 is provided with a coating of tar 24.
 
 
 42
 Arranged concentrically within the electropositive electrode 14 is an electronegative electrode 26 in the form of a cylinder coextensive in length with the electropositive electrode 14. Embedded in the upper end of the electronegative electrode 26 is a copper terminal 28 extending through an opening 30 in the cover 12. The electronegative electrode 26 is of uniform diameter less than the inside diameter of the electropositive electrode 14 so as to provide a space 32 for the liquid contained in the battery. To the terminal 28 is connected one end of a copper coil 34 embedded in the core 36. The electropositive electrode 14 is of considerably smaller outside diameter than the inside diameter of the container 10 to provide a space 38 for the liquid, which space has communication with the space 32 at the bottom of the battery by reason of the ears 18 and also by reason of the fact that the electropositive electrode terminates short of the cover 12.
 
 
 43
 The body 36 of the electronegative electrode 26 comprises fused cuprous chloride (CuCL). In manufacturing the body 36, the coil 34 and the terminal 28 are arranged in a mold and the latter supplied with the requisite amount of cuprous chloride poured from a heated crucible. A piece of wood carbon is placed on the top of the cuprous chloride in the crucible and the latter is heated to a temperature ranging between 400° and 500° centigrade at which the cuprous chloride may be poured. The wood carbon constitutes a catalytic agent which renders the electronegative electrode 26 successful for the purpose intended, the exact chemical action being unknown to me.
 
 
 44
 After the electronegative electrode 36 is removed from the crucible, it is cooled and dipped in a 66° Baumé solution of sulphuric acid. While still dripping wet, the electrode 26 is covered with aluminium powder to prevent oxidation thereof. The electrode 26 is now ready for use.
 
 
 45
 The lower end of the electrode 26 is rested on a wood block 40 on the bottom 16. Both terminals 20 and 28 are firmly anchored in the cover 12 so that all the parts are maintained in fixed relationship when assembled with the container.
 
 
 46
 12. Although all 11 claims of the Adams patent are in suit plaintiffs have relied specifically on claims 1 and 10. The elements of these two claims are as follows:
 
 
 47
 Patent Claim 1

 A battery comprising
 a liquid container,
 a magnesium electropositive electrode
 inside the container
 and having an exterior terminal,
 a fused cuprous chloride electronegative
 electrode,
 and a terminal connected with
 said electronegative electrode.

 Patent Claim 10

 In a battery, the combination of
 a magnesium electropositive electrode,
 and
 an electronegative electrode comprising
 cuprous chloride fused
 with a carbon catalytic agent.
 
 VALIDITY ISSUE
 
 48
 13. Defendant urges that the patent is invalid on the grounds that the invention was fully anticipated by the prior art and is hence invalid under 35 U.S.C. §§ 101 and 102, and that the invention was obvious to those skilled in the art at the time that it was made, and is hence invalid under 35 U.S.C. § 103.
 
 
 49
 14. Defendant has cited 24 prior patents and publications, defendant's exhibits 1-24, identified as follows:
 
 
 50
 Elementary Treatise on Electric Batteries, Niaudet, 1880, pages ix, 200-209;
 
 
 51
 Hayes patent 282,634, 1883;
 
 
 52
 Galvanic Batteries, Bottone, 1902, pages 172-177;
 
 
 53
 Primary Batteries, Carhart, 1891, pages 62-65;
 
 
 54
 Barrett patent 405,196, 1889;
 
 
 55
 Hard patent 457,116, 1891;
 
 
 56
 Hathaway patent 454,598, 1891;
 
 
 57
 Van Tenac patent 184,932, 1876;
 
 
 58
 Fink patent 434,593, 1890;
 
 
 59
 Pearson patent 512,055, 1894;
 
 
 60
 Practical Primary Cells, Codd, 1929, pages 1-3, 43, 44, 78-81, 110, 117;
 
 
 61
 Wood patent 1,696,873, 1928;
 
 
 62
 Ruben patent 1,920,151, 1933;
 
 
 63
 Jumau patent 2,078,143, 1937;
 
 
 64
 Manual of Chemistry, Simon, 1905, page 216;
 
 
 65
 Essentials of General Chemistry, Hopkins, 1946, pages 371, 372, period table;
 
 
 66
 Ferrabino British patent 301,923, 1928;
 
 
 67
 Thurnauer, et al. patent 552,211, 1895;
 
 
 68
 Skrivanoff British patent 4,341 of 1880;
 
 
 69
 Wensky British patent 49 of 1891;
 
 
 70
 Copper-Zinc and Copper-Tin Alloys, Laurie, 1888, pages 104-116;
 
 
 71
 Parkhurst patent 269,454, 1882;
 
 
 72
 Heil patent 653,770, 1900;
 
 
 73
 Harrison patent 1,522,121, 1925.
 
 
 74
 15. Nine of these publications disclose batteries utilizing silver chloride; none of these items disclose the use of magnesium. Four of these publications disclose batteries with magnesium as a component; none of these disclose the use of silver or cuprous chloride. Three of these publications disclose the use of cuprous chloride as a single component; none of these disclose its use in conjunction with magnesium. Two of these publications disclose the use of neither magnesium, nor cuprous chloride, nor silver chloride. A total of 18 of defendant's 24 cited publications disclose either none of the components of the Adams system or at most one single component of the system; none of these 18 items disclose the combination of even two of the components. Only three of defendant's anticipatory references disclose more than one component of the Adams system.
 
 
 75
 16. The Codd textbook (on page 22) mentions magnesium but only for use in a cell in which the other electrode is copper and the electrolyte is dilute sulfuric acid. On page 44, in discussing another battery entirely, Codd discusses silver chloride as an electrode. There is no suggestion in Codd that the materials could be combined in a battery.
 
 
 76
 17. The Skrivanoff foreign patent discloses a battery having an electrode of magnesium, an electrode comprising cuprous chloride mixed together with some seven other substances, and a strong electrolyte. The evidence establishes that the disclosure of this very old patent is inoperative.
 
 
 77
 18. The Niaudet treatise (1880) discloses a battery having an electrode of silver chloride, an electrode of zinc, and plain water as an electrolyte. This disclosure contains no suggestion that magnesium might be substituted for zinc in this battery.
 
 
 78
 19. The Harrison patent, cited by defendant to show the state of the art, discloses a battery in which the electrodes are immersed in sea water on opposite sides of a ship. One electrode is magnesium and the other is copper. The electrolyte is the sea water. The patent explains that because of exposure to sea water, the potential characteristics and current yield for a copper electrode having a given area will gradually improve.
 
 
 79
 20. The Simon article and the Hopkins article, which were not cited by the defendant as anticipatory references, show that magnesium is an alkaline earth metal. The Jumau patent discloses that the electrolyte in a lead chloride-magnesium battery may be a dilute solution of an alkaline earth salt, such as a sulphate or a chloride.
 
 
 80
 21. Summarizing findings 14 through 20, the cited publications and patents do not anticipate the invention defined in the several claims of the Adams patent.
 
 
 81
 22. Each of the elements of the several claims of the Adams patent was individually old in the battery-making art at the time of the filing of the Adams application for the patent here in suit. While there is evidence of a definite need for a battery having the characteristics of the Adams battery, those skilled in the art failed to develop one for a period of over 50 years, during which time all of the necessary ingredients were available. There is no evidence that anyone had ever before suggested the specific combination of elements which make up the Adams battery nor that anyone had ever before suggested that such a battery would have a substantially constant potential, could be operated under extreme temperatures, and could be operated with ordinary or distilled water.
 
 
 82
 23. The Adams invention was the first practical, water-activated, constant potential battery capable of operation at low temperatures. When Adams first disclosed his invention to others skilled in the art, he did not know its theory of operation and it was received with considerable skepticism. However, this development was subsequently recognized throughout the industry as an extremely important step in rounding out the sources of battery-furnished power, and filling important, long-standing needs of both civilian and military natures.
 
 
 83
 24. Summarizing findings 22 and 23, the Adams invention was not, as a whole, obvious, at the time the invention was made, to a person having ordinary skill in the battery art.
 
 INFRINGEMENT ISSUES
 
 84
 25. Plaintiffs contend that batteries embodying the invention and infringing the claims of the Adams patent were used or manufactured by or for defendant without authorization or license of plaintiffs. The parties have stipulated that the batteries identified as trial exhibits 7, 8, and 9 were procured by and delivered to the defendant within the 6-year period preceding the filing of the petition. The parties further stipulated that articles made as described in trial exhibit 1 were procured by and delivered to the defendant within the 6-year period preceding the filing of the petition.
 
 
 85
 26. Trial exhibit 7 is an Eagle-Picher battery unit designated BA-259/AM. Trial exhibit 8 is a Ray-O-Vac battery unit designated BA-292/AM. Trial exhibit 9 is a Ray-O-Vac battery unit designated BA-253/U.
 
 
 86
 27. Trial exhibit 1 includes a letter from The Electric Storage Battery Company, stating that they have supplied to the defendant batteries having cuprous chloride plates made in accordance with United States Letters Patent Nos. 2,640,090, 2,640,091, and 2,667,527. These three patents issued on applications filed after the Adams patent issued. Trial exhibit 1 also includes a letter from Burgess Battery Company stating that the batteries produced by Burgess had a plate made of a paste of cuprous chloride, plastic binder, and graphite. Trial exhibit 1 also includes a letter from The Eagle-Picher Company stating that all the magnesium cuprous chloride batteries which have been produced by Eagle-Picher have been made in accordance with the process outlined in United States Letters Patent No. 2,636,060 and/or Reissue No. 23,883. These two patents issued to the defendant, as represented by the Secretary of the Army, on applications filed after the Adams patent issued. Trial exhibit 1 also includes a letter from Ray-O-Vac Company stating that all of the batteries furnished to the defendant by Ray-O-Vac have had positive plates made in accordance with the process outlined in Patent No. 2,636,060 or Reissue No. 23,883, noted above, by a process involving subjecting a mixture containing cuprous chloride to pressure in a tableting machine to form pellets.
 
 
 87
 28. Trial exhibit 18, a Burgess battery unit designated X10183, is a water-activated, magnesium and silver chloride battery introduced by defendant as illustrative of procurement of such devices during the 6-year period next preceding the filing of the petition.
 
 
 88
 29. Patents Nos. 2,640,090, 2,640,091, and 2,667,527, which are referred to in finding 27, teach a water-activated, magnesium and cuprous chloride battery having a pasted grid type cuprous chloride plate made by mixing cuprous chloride with silver chloride and water, and pasting the mixture on a copper wire screen.
 
 
 89
 30. Patent No. 2,636,060, referred to in finding 27, teaches a process for making cuprous chloride electrodes for water-activated, magnesium, cuprous chloride batteries. The cuprous chloride electrodes are made by making a pasty mixture of cuprous chloride and water and pasting the mixture on wire screens. Patent Reissue No. 23,883, referred to in finding 27, teaches a process for making cuprous chloride electrodes for water-activated, magnesium, cuprous chloride batteries. The cuprous chloride electrodes are made by making a paste of cuprous chloride, a highly polymeric substance and an organic solvent, and pasting the mixture on wire screens.
 
 
 90
 31. Cuprous chloride is available commercially as a powder. To function as an electrode, the powder must be formed by some means into electrode shape. There are several methods of forming cuprous chloride into electrode shape. One method, which is suggested in the Adams patent, is to place the cuprous chloride in a crucible and heat the crucible until the cuprous chloride is pourable. Then the cuprous chloride is poured into a mold where it is allowed to solidify. This "candlestick" method was known prior to 1880. Another method is to add water to cuprous chloride to form a pourable slurry, which, upon drying, hardens into a unified mass. Still another method is to add toluene to cuprous chloride to form a pourable slurry which, upon drying, hardens into a unified mass.
 
 
 91
 32. Defendant alleges that by the use of the term fused cuprous chloride in the claims the Adams patent is limited to batteries using cuprous chloride electrodes made by the heat method. The method of forming the cathode makes no substantial difference in the electrochemical properties of cuprous chloride, whether the method be liquidification by heat, water, or organic material, such as benzene or toluene. There was considerable testimony at the trial both directly and indirectly relating to the term fused. Viewing this testimony as a whole, it appears that the term fused is used by some people as meaning unified only by heat. This limitation is by no means universally accepted and other people use the term as meaning unified by any one of a number of methods. One of the definitions given for fuse in Webster's New International Dictionary (1934 Edition), page 1022, reads: "To unite or blend, as if melted together." The term fused as used in the claims of the Adams patent is found to encompass unification or uniting by various methods and is not limited to unification or uniting by heat.
 
 
 92
 33. Each of Patent Nos. 2,640,090, 2,640,091, 2,667,527, 2,636,060, and Reissue No. 23,883 teaches a unified cuprous chloride electrode which is fused within the meaning of the term as used in the Adams patent and claims.
 
 
 93
 34. Each of trial exhibits 7, 8, and 9 is a pile-type battery. They each have bibulous material which acts as a liquid container, a magnesium electropositive electrode inside the container having an exterior terminal, a fused cuprous chloride electronegative electrode, and a terminal connected with said electronegative electrode.
 
 
 94
 35. The evidence is inconclusive and insufficient to determine whether there is carbon in the electronegative electrodes of trial exhibits 7, 8, and 9, as required by the recital of Adams claim 10. However, since each of these exhibits contains each of the elements of claim 1, it is unnecessary to pass upon this question.
 
 
 95
 36. The cuprous chloride plates manufactured by The Electric Storage Battery Company, Burgess Battery Company, The Eagle-Picher Company, and Ray-O-Vac Company, as described in trial exhibit 1, are fused within the meaning of the term as used in the Adams claims.
 
 
 96
 37. Trial exhibit 18 is a Burgess battery, which includes a liquid container, a magnesium electropositive electrode inside the container having an exterior terminal, a fused silver chloride electronegative electrode, and a terminal connected with said electronegative electrode. It does not have a cuprous chloride electrode.
 
 
 97
 38. Summarizing findings 25 through 37, claim 1 of the Adams patent has been infringed by trial exhibits 7, 8, and 9. Further, the cuprous chloride plates manufactured by The Electric Storage Battery Company, Burgess Battery Company, The Eagle-Picher Company, and Ray-O-Vac Company, as described in trial exhibit 1, would infringe claims in the Adams patent if used in a battery otherwise covered by the Adams claims. Trial exhibit 18 does not infringe claims of the Adams patent.
 
 CONTRACT ISSUE
 
 98
 39. The plaintiffs allege that defendant, through its National Inventors Council, made a general offer of a unilateral contract for acceptance by any member of the public by submission of a useful suggestion, with use by the defendant as a condition precedent to liability of defendant. Further, the plaintiffs allege that Adams accepted the offer by sending disclosures of his invention to the defendant, and that the condition precedent to defendant's liability has been fulfilled by defendant's use of the invention.
 
 
 99
 40. It is found that on January 7, 1942, Adams disclosed his invention to the National Inventors Council; that on January 10, 1942, Adams disclosed his invention to The Chief Signal Officer of the U.S. Army, and that on January 8, 1942, Adams disclosed his invention to the Navy Department. The National Inventors Council replied, asking Adams for more information, which Adams then supplied. Subsequently, Adams informed the National Inventors Council that he was about to receive a patent on the battery, and through the Council he was able to obtain a priority for purchasing magnesium. Both the Signal Corps and the Navy showed immediate interest in the disclosure, and Adams made trips to both Washington, D. C., and Fort Monmouth, New Jersey, where he turned over samples of his battery and made a complete disclosure of his invention to various representatives of the two branches. Subsequently, Adams was in further contact with the personnel at Fort Monmouth and delivered or sent additional information and samples for testing to Fort Monmouth at no expense to the Government. Both the Navy and the Signal Corps finally concluded that the cell offered great promise.
 
 
 100
 41. The National Inventors Council issued two documents which were available to Adams. The first document was Information Bulletin No. 1-Revised, dated March 1941, and contained, inter alia, the following statements:
 
 
 101
 "The submission to the National Inventors Council, under the provisions contained herein, of any description, drawing or other data pertaining to an invention is solely for the purpose of determining its military or naval value. Its acceptance by the Council does not legally obligate the United States Government or act as an estoppel under the patent statutes.
 
 
 102
 * * * * * *
 
 
 103
 "The Council has no authority to consider the question of compensation for the use of a suggestion or invention by any Government Department or agency. Should an invention be utilized, the matter of compensation will be referred to the Executive Department of the Government making use of the product embodying the invention. Final settlement for the acquirement of rights can then be arranged between the inventor and the appropriate official of the Department making the purchase.
 
 
 104
 "The amount of compensation can be considered only after tender of the suggestion or invention, and its adoption by an executive branch of the Government. The creation of the Council does not in any way affect the existing laws or practices of the Government Departments as to compensation."
 
 
 105
 The second document was Information Bulletin No. 2 — Revised 1942, and contained, inter alia, the following statement:
 
 
 106
 "* * * In such event, the appropriate departments of the Army and Navy then deal directly with the inventor in making the necessary arrangements for the use of the invention. The Council itself does not consider the question of compensation or contracts between inventors and the Army or Navy. The negotiation of such contracts is conducted by the appropriate Military and Naval authorities."
 
 CONCLUSION OF LAW
 
 107
 Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that United States Letters Patent 2,322,210 is valid; that the invention covered by said patent was used by defendant without authorization of the patent owners, and that plaintiffs are entitled to recover reasonable and entire compensation for such unauthorized use, and judgment will be entered to that effect. The extent of liability will be determined in further proceedings before a trial commissioner, pursuant to Rule 47(c) (2).
 
 
 
 Notes:
 
 
 [1]
 Now Rule 57(a)
 
 
 [2]
 Since we hold that the Government has used plaintiffs' valid patent without authorization, we find it unnecessary to decide the isue of breach of an alleged implied contract to compensate plaintiffs for use of the invention because the amount of recovery would not be changed by a decision on that issue. The amount of recovery under plaintiffs' contract claim would not be greater than that under the patent infringement claim: under plaintiffs' theory, the period for which contract recovery may be had is from 6 years prior to the filing of the present suit to date (Plaintiffs' Reply Brief, page 146); and the measure of recovery under the contract theory would be a reasonable royalty as compensation, McKeever v. United States, 14 Ct.Cl. 396, 425-426 (1878), which is substantially the same as the reasonable and entire compensation in infringement actions under 28 U.S.C. § 1498
 In this regard it is of interest to note our recent decision in Padbloc Company v. United States, Ct.Cl. No. 523-57, decided April 5, 1963, in which we found an implied contract and so it was unnecessary to decide the patent infringement issue.