Rudolph **TIETIG**, Jr., and Daniel J. Pollingue, Jr., Plaintiffs,

v.

David L. **LADD**, Commissioner of Patents, Defendant.

Civ. A. No. 4004–62.

United States District Court District of Columbia.

April 29, 1964.

638

Irvin H. Rimel, Washington, D. C., Russell H. Clark, Chicago, Ill., for plaintiffs.

Clarence W. Moore, Sol. Washington, D. C., for defendant.

JACKSON, District Judge.

This civil action was instituted pursuant to 35 U.S.C. § 145 seeking judgment authorizing the defendant, Commissioner of Patents, to grant a patent on an application[1] Serial No. 750,603 entitled "Method of Adding Solid Material to Molten Metal", filed on July 24, 1958, by the plaintiffs, Rudolph Tietig, Jr., and Daniel J. Pollingue, Jr.

The invention at bar relates to a method of adding predetermined quantities of solid material additives such as manganese, ferrosilicon, and aluminum to the ladle during the tapping operation of an open-hearth furnace. The solid material is supported above the ladle by a pan capable of being vibrated by electromagnetic means, and during the tapping operation the pan is vibrated at a variable rate so as to discharge the alloying materials into the ladle at a rate of flow proportioned to the flow of the molten metal being drawn from the furnace.

There are two claims in issue in this case, and both parties agree that they stand or fall together. They are as follows:

"8. The method of adding solid alloying material in discrete form to molten steel for alloying purposes, the steps which include tapping a steel furnace into a ladle, supporting the alloying material above the ladle by means of a vibratory pan, discharging the alloying material from said pan into the ladle during the tapping operation by vibrating said pan, and regulating the discharging rate for said alloying material by varying the vibratory motion of the pan so as to proportion the discharge of the alloying material to the rate of flow of molten steel into the ladle.

"9. The method of adding solid material in discrete form to molten steel as defined by claim 8, wherein the step of tapping the steel furnace is conducted in a manner to cause a swirling motion of the metal in the ladle, and wherein the alloying material is discharged into the ladle at a point adjacent the entry of the molten steel into the ladle."

The tribunals of the Patent Office rejected those claims as unpatentable over the Reebel publication, and the McCon-

1. This application is a division of application Serial No. 642,291, filed February 25, 1957, which itself was a continuation-in-part of application Serial No. 397,450 filed December 10, 1953. Application Serial No. 642,291 issued as Patent No. 2,872,180 on February 3, 1959 with claims drawn to an apparatus for performing the method claimed in the applications in suit.

nell patent No. 1,318,164 in view of the Gebo patent No. 2,539,070. At the trial counsel for defendant introduced into evidence the Brassert patent No. 2,277,067.

The Reebel publication on pages 95 and 96, discusses the making of open-hearth steel, and states that crushed alloying solid materials "contained in bags may be thrown into the ladle—or they may, more preferably, from a uniformity standpoint, be added in regulated amounts into the spout or ladle by means of a hopper, operated by a long lever controlled by the furnace man."

McConnell discloses a process by which super-refined or "special steels" may be obtained by gradually adding crushed alloying materials to the ladle while the molten steel is being poured or tapped from the furnace. In his process McConnell utilizes a container mounted on a pivot above the ladle which is tilted by the furnace operator so as to pour alloying materials into the ladle at the proper time.

Gebo discloses metallurgical processing equipment employed in conjunction with ore sintering machines. A vibrating feeder mechanism and pan is employed to convey hot fines (discharged from the sintering machine) to a conveyor belt. A switch controls the vibrating feeder, and the switch is actuated by the weight of the insulating materials present on the conveyor belt. As long as there is sufficient insulating lead material on the conveyor belt, the switch allows the vibrating feeder mechanism to discharge the hot refined fines onto the belt. The vibrating feeder mechanism is set so the discharge rate is at one speed and the switch merely turns the feeder on or off.

Brassert discloses a process for producing steel directly from the ore without a melting step. This is accomplished by mixing the powdered ore with carbon, and then heating the mixture while vibrating it at a high frequency to reduce the iron oxides of the ore. The powdered ore and carbon are fed from separate hoppers discharging upon vibratory pans.

The tribunals of the Patent Office stated in their rejection that in view of the teachings of Reebel and McConnell, which disclose adding alloys gradually to the ladle, it would be obvious to one skilled in the art to substitute a vibrating feeder mechanism such as that shown by Gebo or Brassert for the hopper arrangement of McConnell to obtain better feeding control when adding alloys to the ladle. They also ruled it would be obvious to make the rate of addition of these alloys proportional to the amount of steel flowing into the ladle during the pouring operation.

The Patent Office admits none of the references in the case disclose the plaintiffs' proportionate feeding, but suggests the recitation of "so as to proportion the discharge * * * to the rate of flow" in claim 8 is so broad that it would be met by addition of alloying material from a vibrating pan at any rate whatsoever.

█ Initially, it should be stated that this Court is aware of the presumption of correctness that is attached to the decisions of the Patent Office. Cook v. Watson, D.C. 181 F.Supp. 896; Abbott et al. v. Coe, 109 F.2d 449, 71 U.S.App.D.C. 195, and Schaefer v. Watson, 109 U.S. App.D.C. 360, 288 F.2d 144.

█ Nevertheless, this is a trial de novo, and if the plaintiffs have shown the Board of Appeals' decision is clearly erroneous or lacks a rational basis, it must find for the plaintiffs.

As evidence accumulated at trial, it became clear that plaintiffs' method of feeding alloys into a ladle by means of a vibratory pan was indeed a "new and useful process" within 35 U.S.C. § 101 since no record existed of it ever having been done before. This narrowed the issue to whether, under the language of 35 U.S.C. § 103, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *."

The question of "obviousness" has been a continuing source of discussion among the Courts, and is acknowledged by the writers to have no rigid definition. Certain factors have traditionally been influential, however, in determining in particular instances whether a given difference between what was known and what was done would have been "obvious" at the time.

One of these factors, that when present weighs heavily in favor of patentability, is the satisfaction of a long felt want in the industry to which the invention applies. Kelley et al. v. Coe, 69 App.D.C. 202, 99 F.2d 435, and Kaakinen et al. v. The Peelers Company, 301 F.2d 170 (9th Cir. 1962). It was shown by undisputed evidence at trial that the steel industry has for some time been looking for a more effective way to introduce alloying components into the ladle during furnace tapping operations.

Testimony disclosed that with plaintiffs' feeder the amount of alloy that can be added to the ladle has increased from a limit of 17 lbs. with prior art devices to a present limit of 30–31 lbs. It was also disclosed that it is possible to predict with far greater accuracy the final percentage of alloy that will be retained in the finished steel. Further, it was shown that the number of "mis-heats" that had to be scrapped due to unsatisfactory alloy percentages was markedly reduced. Finally, it was demonstrated that plaintiffs' invention has materially reduced the cost of making steel by creating savings in the total amount of alloy material used.

The undisputed cost reductions were estimated at trial to be approximately 30¢ per ton in savings of manganese alone. A steel executive testified that through these lower production costs it was possible to pay for installation of machinery performing plaintiffs' method in only one month.

With such obvious advantages plaintiffs' method immediately became a commercial success.

The evidence also showed that prior to plaintiffs' invention the steel industry had for some time relied on the methods disclosed in Reebel and McConnell. These methods were inferior to plaintiffs' because they were not dependable, viz., they were not reliable because the furnace man could not be sure they would give him the amount of additives at the time that he needed them due to the clogging and sticking of the additives in the mouth of the hopper.

Since no two taps of a furnace have the same flow characteristics it is important that the furnace man will be able to control precisely the amount of additives going into the ladle at all times. The prior methods could not accomplish this due to the clogging and sticking tendencies of the additives. Moreover, the evidence shows that plaintiffs' method became the standard of the industry within a short time after it had been put on the market.

Defendant responded to the above evidence only by stating that it was the apparatus and not the method that has enjoyed the commercial success. It was clearly shown, however, that the apparatus has assumed many forms depending on each specific application. The single principle all applications have in common is the use of plaintiffs' method.

When turning to the question of obviousness in view of the prior art, the Court first notes that the McConnell teaching has been in the art since 1919, and that vibrating feeding mechanisms have been known since the early part of 1940. Plaintiffs, however, are the first persons to combine them.

The Court realizes there are cases which hold that mere age of the prior art is not enough to establish unobviousness. In re Beauchamp, 210 F.2d 309, 41 CCPA 791 (1954), and In re Rosenberger, 116 F.2d 507, 28 CCPA 818 (1941). However, in the highly competitive American steel industry it seems to the Court that if the plaintiffs' change was obvious the pressure of circumstances would have prompted it long ago. Cost reductions of many cents per ton in the steel industry cannot be taken to be a matter of

only casual concern. All the evidence, taken together, suggests substantial attention must have been given to this problem with no solution.

Turning to an examination of the prior art, it can be safely stated that both Reebel and McConnell show that gradually adding alloys to a pouring ladle during the tapping process of an open-hearth furnace is old. Further, it appears that vibratory pans are well known devices for feeding small particles from a hopper to a depository area in a continuous stream.

Neither Reebel nor McConnell, however, in any way suggest varying the rate of alloy discharge from the hopper so as to increase it or decrease it in conformance with the variable flow of molten steel from the furnace.

In view of the remarkable metallurgical and economic advantages resulting from such a variation in flow, and in view of the fact that none of the devices in current use are capable of suggesting, let alone providing, such a variance, it does not appear to the Court that it was at all "obvious" to conceive of such a new method at the time plaintiffs did so. It seems, rather, that the plaintiffs' invention was a long sought answer to a specific and enduring problem in the steel industry.

In support of its rejection for "obviousness", the Patent Office has stated that since a predetermined amount of alloy is to be added over a limited period of time it would be obvious to vary it in proportion to the rate of the steel's flow into the ladle. Since the devices now in use that are designed to supply this predetermined amount of alloy in this limited period of time are in fact incapable of providing a varied, or even reliable rate of flow, and for that reason have been rapidly superseded in the market by devices following plaintiffs' method, this allegation is not well taken. This variation of flow has never before been accomplished by any method known to the steel industry even though its decided superiority in result has been long desired.

The Patent Office further stated that it would be obvious to use a vibratory pan to achieve this variable flow. Manifestly, since there is no suggestion in Reebel or McConnell of varying the flow of alloy in conformance to the flow of steel, it is difficult for the Court to see how the references could suggest using a vibratory pan to do so. The pan of Gebo, cited by the Patent Office, is not capable of variable feeding since its control is limited to a stop and start switch, and its rate of feeding is constant. The pan of Brassert, introduced at trial by counsel for the Patent Office, is capable of variable flow, but is used in fact to provide a constant flow after being adjusted to a given setting. Neither of those references contain any suggestion that they might be used in the environment, or to accomplish the purpose chosen by plaintiffs. The Court does not believe the combination of these references with Reebel or McConnell would have been obvious at the time to a person having ordinary skill in the art without having plaintiffs' disclosure to guide him. In re Scott, 323 F.2d 1016 (1963).

Finally, the Patent Office maintains the word "proportion" in claim 8 is broad enough to include any feeding rate whatever, since any given rate would supposedly constitute some mathematical proportion to the rate of flow of the steel. This appears to be a perversion of the term "proportion", and an obfuscation of the clear purpose of its use in the claim. The word "proportion", taken in context of the rest of the claim, and the application as a whole, obviously signifies that the alloy discharge rate is "regulated" in a manner bearing some relatively constant ratio to the discharge rate of the steel. To suggest otherwise is to ignore the plain meaning of the entire invention.

It has been continually held that references may not be combined where "there is no suggestion in either of the references that they can be combined to produce appellant's result". In re Shaffer, 229 F.2d 476 (1956), and In re Hortman, 264 F.2d 911, 46 CCPA 814 (1959). As previously stated, the Court does not believe from the evidence at trial that such a suggestion would have

been made to a person having ordinary skill in the art.

After weighing the evidence at trial and examining the briefs of the parties, the Court, for the reasons stated hereinbefore, finds for the plaintiffs, and against the defendant, and authorizes the Commissioner of Patents to grant a patent to plaintiffs containing method claims 8 and 9.

The above Opinion contains Findings of Fact and Conclusions of Law.