**MASCHINENFABRIK RIETER A. G.,**
Plaintiff,

v.

**GREENWOOD MILLS** and Continental/Moss-Gordin, Inc.,
Defendants.

Civ. A. No. 69–824.

United States District Court,
D. South Carolina,
Greenwood Division.

March 23, 1972.

Hugh A. Chapin, Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, Thomas A. Evins, Butler, Means, Evins & Browne, Spartanburg, S.C., for plaintiff.

Thomas B. Van Poole, Mason, Fenwick & Lawrence, Washington, D.C., Howard L. Burns, Burns, McDonald, Bradford, Erwin & Few, Greenwood, S.C., for defendants.

## ORDER

BLATT, District Judge.

### Findings of Fact and Conclusions of Law

This is a civil action under 35 U.S.C. §§ 271 and 281, for patent infringement of United States Letters Patent Number 3,029,477 (hereafter the '477 patent) entitled "AUTOMATIC CARDING PLANT". There is no question as to jurisdiction or venue. Defendants admitted in their Answers and Counterclaim that this Court has jurisdiction under 28 U.S.C. § 1338(a). Venue is proper under 28 U.S.C. § 1400(b) as defendant, Greenwood Mills (hereafter "GREENWOOD") has a regular and established place of business within the District and its accused infringing installation at Joanna, South Carolina, is located within the District. As to defendant, Continental/Moss-Gordin, Inc. (hereafter "C/MG"), it submitted to the venue of this Court in its Motion to Intervene and its subsequent Answer and Counterclaim.

### I. The Parties

Plaintiff, Maschinenfabrik Rieter A.G. (hereafter "RIETER"), filed its com-

plaint on October 8, 1969 against Greenwood, seeking an injunctin against continued infringement by Greenwood's use of the C/MG card chute feeding system, an accounting for damages, and other relief. After extensions of time for answering, defendant, C/MG, moved to intervene. This motion was consented to by plaintiff and, by Court Order, C/MG intervened on May 19, 1970. By their answer, both defendants asserted that the patent in suit was invalid and not infringed and both counterclaimed for a declaratory judgment to that effect. At trial, defendant, C/MG, having fully indemnified Greenwood against any liability, presented the defense. Thus, the real parties in interest are Rieter and C/MG. At trial, counsel for plaintiff formally waived any claim of damages against Greenwood for the C/MG installation at the Joanna Plant of Greenwood.

Rieter is the assignee of the patent in suit from three joint inventors, Wildbolz, Binder and Staheli. The patent issued on April 17, 1962 based on application Serial Number 840,395, filed in the United States Patent Office on September 16, 1959. This application was based upon two Swiss applications, one of which, Serial Number 73,862, filed in Switzerland on June 1, 1959, was claimed as the priority date under 35 U.S.C. § 119 for claims 1 through 12 of the patent in suit. This date of June 1, 1959 is the date of invention for claims 1, 5, 6, 8 and 11 which are charged to be infringed in this case.

Rieter is a Swiss manufacturer of textile machinery including equipment manufactured under the patent involved in this lawsuit. It sells and services its equipment in the United States through American Rieter Co., a wholly owned subsidiary, located in Spartanburg, South Carolina.

C/MG, a Delaware corporation, having its principal place of business in Pratt-ville, Alabama, is a wholly owned subsidiary of Allied Products Corporation of Chicago, Illinois. Prior to 1966 when it entered into the manufacture of textile machinery, including the card chute feeding system accused of infringement in this suit, it manufactured cotton ginning equipment

## II. The Background of the Technology Involved in this Lawsuit

### A. Lap Feeding of Cards

The technology involved in this lawsuit concerns the feeding of carding machines in the process of yarn manufacture in a textile spinning mill. Carding is an intermediate step in the spinning process which begins by the delivery of synthetic[1] fiber or ginned cotton in baled form to the opening room of the mill where the bales are unstrapped and fed into hopper feeders for delivery to opening and cleaning equipment. This cleaned and fluffy opened cotton must be transported to and delivered to the next processing machine, i. e., the carding machine or card. Ideally, the cotton when fed to the card must have a uniform compactness, or weight per unit length.

The conventional method of card feeding which has been used for a great many years is by means of a lap[2] which is fed to the cards. This is accomplished by transporting the opened cotton from the opening equipment to a large and complex machine called a picker. This machine serves to further open and clean the cotton and then forms a relatively compact lap which is rolled into a large lap roll, severed from the picker and transported to the receiving end of the card where it is spliced by hand into the card feed when the preceding lap has run out.

The card receives the batt or lap at a relatively slow rate and combs, or aligns, the individual fibers to form a fine, delicate web at the output end of the card. This fine web is funnelled into a

1. While applicable to both synthetics and cotton, the process for simplicity will be described in terms of cotton yarn manufacture.

2. The term "lap" is normally used in this art when it is formed by a picker.

so-called trumpet which shapes this web into a round sliver having a diameter of approximately ½ inch. The sliver is then coiled into cans which are then transported to the input end of a drawing frame which serves to attenuate and align the fibers in the sliver. In addition to being drawn, the sliver is passed through roving and ring spinning operations which serve to further align and twist the fibers to produce yarn having the desired tensile strength and appearance. Normally one (1) inch of sliver from a card yields approximately 100 inches of finished yarn.

### B. *The Recognized Problems in Lap Feeding*

It was well recognized by both textile machinery manufacturers and by spinning mill operators and personnel that there were many inherent problems involved in lap feeding and the use of the picker to form a lap for feeding to the card. Ideally, the material fed to the card should be as opened as possible. However, in the picker after the fibers are opened and cleaned it is necessary to physically compress and bind the fibers together to form the lap because of the need to transport the material to the card. This compressed lap is undesirable in many instances as feed material for the card as it may produce non-uniformities in the resulting yarn and can serve to damage the card.

Some other typical problems associated with the picker and lap feeding are the skill required to join consecutive laps, the unhealthy and dangerous working environment, costs of equipment and personnel, irregularities formed in the lap during the formation of the compressed picker lap and the subsequent manual handling thereof, waste formed during the feeding of consecutive laps at the feed end of the cards, sliver breaks caused by faulty joining of the laps, curliness and neps formed during the opening and picking, and the lack of consistent control in this entire process.

The necessity for uniformity in width, thickness and compactness of the material fed to the cards has always been of critical importance. If the material is uniform in weight per unit length then the sliver weight per unit length will be correspondingly uniform and, hence, the yarn produced will be uniform. On the other hand, if the material fed to the cards is not uniform, then the sliver produced will vary in uniformity and this non-uniformity will be either present in the yarn produced or may require further expensive and time consuming process steps to remove the non-uniformities.

Prior to the invention of the patent in suit, textile machinery manufacturers had long recognized these difficulties and problems and various attempts had been made to solve them. Textile machinery researchers, however, concerned with these problems in the 1950's, concentrated on improving the operation of the pickers and the picker lap feeding operation. From time to time, some research had been done and systems proposed to feed cards directly and thus eliminate the picker and lap feeding of cards. All of these attempts, however, were commercially unsuccessful. Prior to the invention covered by the patent in suit, no commercially workable pneumatic or mechanical chute feeding system had been devised to eliminate the picker or picker lap and the inherent problems created by the use thereof.

### C. *Synopsis of the Operation of the Rieter and C/MG Systems*

The C/MG direct card chute feeding system installed at Joanna and the Rieter Aerofeed [3] system installed at Judson Mills of Deering Milliken, both of which this Court observed in operation, pneumatically transport the opened cotton from the opening equipment through a main supply duct extending over each line of cards (8 cards in a line at Joanna Mills and 10 cards in a line at Judson Mills). The receiving end of

---

3. "Aerofeed" is the registered trademark of Rieter for the system covered by the patent in suit.

each card is connected to the main supply duct by a vertical chute or depositing duct which receives cotton from the supply duct. In the depositing ducts the cotton is compacted to form a uniform endless batt [4] which is continuously fed to the card. By the direct card chute feeding system involved herein, the picker is eliminated.

The essence of the '477 patent in suit consisted in the direct feeding of a uniform batt to cards by the use of super-atmospheric pressure to pneumatically convey cotton from the opening equipment through a horizontal supply duct and into the vertical depositing ducts or chutes. In each chute the super-atmospheric pressure and the resultant pressure difference between the top and bottom of the chute produces controlled compaction of the cotton and insures that the weight per unit length of the resulting batt fed to the cards is uniform. By providing this superatmospheric pressure in both the horizontal supply duct and vertical chutes and this air pressure difference, significant necessary control of the uniformity of the material fed to the cards is assured and thus uniformity of the sliver weight and hence uniformity of the finished yarn is assured. It is this concept and this result which formed the basis for developing the Rieter patented direct card feeding system which provides for a batt consistency and quality that was equal to or better than lap feeding while, at the same time, eliminating the many problems inherent to a picker operation.

D. *The History of the Development of the Patent in Suit and the Rieter Aerofeed System*

In the mid 1950's, the inventors of the patent in suit were employed in Rieter's textile spinning machinery research department and were requested to investigate the possibility of developing a direct card feeding system. Within Rieter,

some people viewed the idea with skepticisim and others doubted the operability and commercial acceptability of any type of system which would eliminate the established procedures using the long accepted picker. Both groups discouraged continuing research on the project. As evidence of this dichotomy within Rieter, Mr. Wildbolz, while working on the development of the patented system, also was charged with responsibility for developing improved pickers.

In the development of a direct chute feeding system, the inventors tried various ways of card feeding in an attempt to produce a uniform batt. One unsuccessful method was to deliver the cotton tufts to a chute by using a pulling, or sub-atmospheric system. This was subsequently abandoned, and after a period of some two years, the inventors conceived and reduced to practice the process of direct feeding of opened cotton tufts to a card by the use of superatmospheric pressure in a horizontal overhead feed duct and in the vertical depositing ducts.

There is no evidence in this record that at the time of this development, any direct chute feeding systems using pneumatic pressure were being developed or constructed anywhere else in the world.

After the development of the Rieter system it was installed at a mill in Switzerland and privately exhibited to several large textile manufacturers, including Deering Milliken (hereafter "MILLIKEN") in 1961. As Mr. Fitzgerald [5] testified, in 1961, Milliken had under design an experimental or prototype textile mill in which the most modern and best available equipment would be installed. As part of this project, Milliken made a detailed study of all available card feeding systems throughout the world. Each system was evaluated within the Milliken organization and recommendations were made. Based upon this

---

4. The term "batt" is normally used in this art to designate the endless lap that is fed to the card in a direct card feeding system.

5. Vice President of the Deering Milliken Service Corp.

evaluation and recommendation, Milliken ordered a Rieter Aerofeed system of 36 chutes for installation at the Milliken protoype plant in Spartanburg, South Carolina. After it was built, access to this plant was given to textile producers and textile manufacturers in the U.S. Subsequently, in 1965, when Milliken sought to modernize its Judson Mill, it again made a survey of available card feeding systems and again ordered the Rieter Aerofeed system. Some 66 chutes were installed at Judson Mills.

In 1963, the Aerofeed system was first publicly exhibited at the International Textile Machinery Exhibition in Hanover, Germany. The patented system was also shown at other exhibitions, including an exhibition in the United States at Atlantic City in 1965. Commencing then and continuing to date, it has achieved extensive worldwide commercial success.

### E. *The History of the Development of the Accused C/MG System*

In 1966, the defendant, C/MG, entered the card chute feeding market. As testified to by Mr. Towery, the designer of C/MG's system, he saw but did not closely inspect, the Rieter system in 1965 at the textile equipment exhibition in Atlantic City. At that time, C/MG's management was attempting to diversify and expand into the textile machinery field.

C/MG commenced the actual design of its accused system in 1966 following an inquiry by Greenwood made at the Greenville South Carolina Textile Show as to whether C/MG could produce a chute feeding system for cards. This inquiry, coming as it did in 1966 after the patented Rieter Aerofeed system had gained public recognition, requested the furnishing of the *solution* (direct card feeding) rather than presenting the *problem* (elimination of the picker) and inquiring if there was any solution.

### III. *The Issues*

The sole issues in this case are the validity of the Wildbolz '477 patent and the infringement of claims 1, 5, 6, 8 and 11 thereof.

### IV. *The Validity of the Wildbolz et al '477 Patent*

#### A. *The Patent Enjoys a Statutory Presumption of Validity*

[1-4] A patent by statute, 35 U.S.C. § 282, is presumptively valid and the burden of overcoming this presumption is upon the party attacking the validity of the patent. This is a substantial burden. As stated by Judge Hemphill of this Court in Grinnell Corp. v. American Monorail Co., 285 F.Supp. 219, 223 (D.S.C.1967):

> "It is well established that the Congressionally pronounced presumption, while rebuttable in a proper case, is not lightly overthrown and that every reasonable doubt is to be resolved against the party attacking a patent's validity. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 640 (4th Cir. 1943).

> "The presumption of validity, and the severe burden it places on defendant, are based largely on the fact that to hold a patent invalid in an infringement action involves the overruling of a decision by an arm of a co-ordinate branch of the Government specially empowered to pass upon patentability and specially trained in the technical questions involved. Thus, it is the duty of the Patent Office carefully to examine each patent application in the light of all statutory requirements for patentability and to withhold issuance unless 'it appears that the applicant is entitled to patent under the law.' (35 U.S.C. Section 131)."

See also, Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934); and Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 640 (4th Cir. 1943).

## B. Defendant's Contentions Regarding the Invalidity of the Patent in Suit

In attempting to overcome the presumption of validity of the patent in suit, defendants contended that:

1. The claims 1, 5, 6, 8 and 11 of plaintiff's '477 patent in suit are invalid for failure to particularly point out and distinctly claim the subject matter sought to be patented, as required by 35 U.S.C. § 112;

2. The claims 1, 5, 6, 8 and 11 of the patent in suit are invalid for failure of the specification of the patent to describe the subject matter in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains to make and use the same, as required by 35 U.S.C. § 112; and

3. The claims 1, 5, 6, 8 and 11 of the patent in suit are invalid for failure to define subject matter which as a whole would have been non-obvious at the time the invention was made to a person having ordinary skill in the art, pursuant to 35 U.S.C. § 103.

## C. Defendant's 35 U.S.C. § 112 Argument

The first two contentions are basically the same and both relate to 35 U.S.C. § 112 which requires that the specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

By the words of the statute itself and by judicial interpretation it is established law that patent specifications and claims are addressed to men of ordinary skill in the art. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 65–66, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Otto v. Koppers Co., 246 F.2d 789, 797 (4th Cir. 1957); Lever Bros. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 638–640 (4th Cir. 1943); Procter & Gamble Mfg. Co. v. Refining, Inc., 135 F.2d 900, 906 (4th Cir. 1943); United Industrial Chem. Co. v. Theroz Co., 25 F.2d 387, 392 (4th Cir. 1928); and Grinnell Corp. v. American Monorail Co., *supra*.

The question under 35 U.S.C. § 112 is whether or not the specification and claims were sufficiently detailed to enable a man of ordinary skill in the art to construct a card chute feeding system in accordance with the teachings of the patent in suit and to determine from the claim language the scope of the patent coverage.

This Court finds that the presumption of validity has not been overcome by defendant's attack on the specification and claims as insufficient under 35 U.S.C. § 112. The specification and the claims are neither vague nor indefinite. The claims particularly point out and distinctly claim the subject matter which the applicants regarded as their invention. The specification contains sufficient teachings to enable a man of ordinary skill in the art to construct a card chute feeding system. It clearly teaches the use of superatmospheric pressure to convey cotton in an overhead duct and to deposit the material in vertical chutes. Further, the evidence established that the specification adequately teaches a man skilled in the art of carding the role which the superatmospheric pressure plays in the controlled compacting of the cotton to form a uniform batt for feeding to a card.

With respect to the defendant's contention that the specification requires experimentation to determine the desired pressures to be used in such a system, the defendant's witnesses testified that adjustment of the operating pressures used in a cotton transporting system is routine practice and is often

necessary during the installation and initial periods of use of any such system.

### D. *Defendant's Obviousness Arguments*

#### 1. *The Applicable Standards*

With respect to the question of invalidity because of prior art, defendant relied solely upon 35 U S.C. § 103, which states:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be neglected by the manner in which the invention was made."

■ The recent Supreme Court case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) set forth the tests and criteria to be used by the courts in determining "obviousness" under § 103.

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." 383 U.S. at 17–18, 86 S.Ct. at 694.

From the foregoing quote, it is clear that the determination of obviousness is measured not by a subjective standard of quality but by an objective standard of inquiry.

In Reiner v. I. Leon Co. Inc., 285 F.2d 501, 503–504 (2nd Cir. 1960), Judge Learned Hand presented his "factors" to be considered in determining this issue of obviousness:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?"

■ This Court also recognizes that hindsight reconstruction of the prior art is not the applicable standard. As stated in § 103 the criteria is "that the subject matter as a whole would have been obvious *at the time* the invention was made." (Emphasis added). Thus the scope and content of the prior art must be viewed with foresight at a time immediately prior to the invention and not by reconstruction of the art after the invention and its commercial acceptance.

As stated by the Supreme Court:

"It only remains now for the wisdom which comes after the fact to teach us that Jones discovered nothing, invented nothing, accomplished nothing.

"We cannot better conclude this opinion than by the following extract from the opinion of Mr. Justice Bradley in Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, 1181: 'But it is plain from the evidence, and from the very fact that it was not

sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. . . . Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' " Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 446, 22 S.Ct. 698, 715, 46 L.Ed. 968 (1902).

And from the Fourth Circuit case:

"It is easy to say now that what Mayo did was simple and obvious; but nobody seems to have thought of doing what he did until he did it. Knowledge after the event is always easy, and problems once solved appear as never having presented difficulty. We must try, however, to avoid the danger which Judge Evans has recently pointed out of thinking there is no invention merely because we can understand a mechanism after it has been explained to us. National Slug Rejectors v. A. B. T. Mfg. Corp., 7 Cir., 164 F.2d 333, 336. As said by Mr. Justice McKenna in the Grant Tire Case, 'the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration.' Diamond Rubber Co. of New York v. Consol. Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527; United States Industrial Chemical Co.

et al. v. Theroz Co., 4 Cir., 25 F.2d 387; Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59." Florence-Mayo Nuway Co. v. Hardy, 168 F.2d 778, 781 (4th Cir. 1948).

2. *The Application of the Standards to the Prior Art*

■ Turning to the prior art, defendants originally cited some 39 items of prior art. At trial, C/MG relied upon 17 domestic and foreign patents and 3 articles as showing the background state of the art, while it primarily relied upon some 14 patents showing various features relating to the issues of lack of invention or obviousness. It is clear from the large number of prior art patents relied upon and their content that none of this prior art anticipated the invention or made it obvious. In fact, there is no single item or combination of prior art in this record which taught or appreciated the possibility of directly feeding a uniform batt to a card by using superatmospheric pressure to pneumatically convey cotton from the opening equipment through a horizontal supply duct and into vertical depositing ducts or chutes. Further, no single item or combination of prior art taught or appreciated the possibility of producing the controlled compaction of the cotton and insuring that the weight per unit length of the resulting batt fed to the cards is uniform. As shown by defendant's Exhibit 47, defendant attempted to select individual elements from many patents in an attempt to reconstruct the prior art and thereby establish the "obviousness" of the patented combination. Such reconstruction of a large number of prior art patents is rejected by this court as Judge Parker similarly rejected such reconstruction in the Fourth Circuit case of Reynolds v. Whitin Mach. Works,[6] 167 F.2d 78, 83–84 (4th Cir. 1948):

"Defendant has cited 21 patents as basis for its contention that complain-

---

6. Of interest in this case is the fact that the technology also involved carding and spinning machinery.

ants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different character, or that there have been prior attempts to solve the problems with which he was confronted which have not met with success. [citing extensive case authority]. Patents for useful inventions ought not to be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

The following quotation from Adams v. United States, 330 F.2d 622, 624, 165 Ct.Cl. 576 (Ct. of Cl., 1964), aff'd 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) is also particularly appropriate:

". . . The volume of the prior art points to the novelty of the Adams invention. It has been frequently held that voluminous prior art indicates that none of the prior art is in point or indicates that prior attempts to solve the problem have not yet met with success."

See also, Schmitt Foundation v. Stockham Valves & Fittings, Inc., 292 F.Supp. 893, 907 (N.D.Ala.1966).

Further, most of the items of prior art C/MG relied upon, especially from the cotton ginning field, are patents dating back to the eighteen and early nineteen hundreds.

"The Eames and Judson patents were over seventy years old at the time of the Caplan inventions. The age of these patents tends to negate any inference that the Caplan patents were obvious on the basis of these ancient patents." H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 163 U.S. P.Q. 106, 114 (N.D.Ohio 1969), aff'd 437 F.2d 244 (6th Cir. 1971).

Also,

"The Court realizes there are cases which hold that mere age of the prior art is not enough to establish unobviousness. In re Beauchamp, 210 F.2d 309, 41 CCPA 791 (1954), and In re Rosenberger, 116 F.2d 507, 28 CCPA 818 (1941). However, in the highly competitive American steel industry it seems to the Court that if the plaintiffs' change was obvious the pressure of circumstances would have prompted it long ago. Cost reductions of many cents per ton in the steel industry cannot be taken to be a manner of only casual concern. All the evidence, taken together, suggests substantial attention must have been given to this problem with no solution." Tietig v. Ladd, Comr. Pats., 228 F.Supp. 637, 640 (D.D.C.1964).

Of all the references cited only two, namely the Penney Patent U.S. 1,694,950, issued December 11, 1928 (hereafter "PENNEY" patent) and the Aono Patent U.S. 2,964,802, effectively filed August 5, 1957 (hereafter "AONO" patent) related to the card chute feeding art. Both of these patents relied upon mechanical rather than pneumatic transportation of the opened cotton to vertical chutes and solely on gravitational compaction within the chutes. There was neither a teaching nor an appreciation in either patent of the concept of using superatmospheric pressure in either the overhead feed duct or in the vertical depositing ducts.

As the record establishes, the Penney patent had made no impression on the art and had long been abandoned as a solution to the long existing picker problems. Further, this patent was cited by the Patent Office Examiner as his primary reference during the prosecution of the patent in suit and thereby became a file wrapper reference against the patent. The distinctions and arguments regarding the Penney patent made by the applicants during the prosecution of the patent in suit were accepted by the Patent Office and it issued the patent.

The fact that the Penney patent was a primary reference cited by the Patent Office strengthens the already strong

presumption of validity of the patent in suit.

As stated in a recent Fourth Circuit case:

"The fact that the defendants were unable to come up with any prior art more pertinent than the McIntyre patent strengthens the presumption of the validity of the patent in suit. As was said in Reynolds v. Whitin Mach. Works, 167 F.2d 78, 84 (4th Cir.), certiorari denied, 334 U.S. 844, 68 S. Ct. 1513, 92 L.Ed. 1768 (1948), '* * * patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments.' In Chesapeake & O. Ry. Co. v. Kaltenbach, 95 F.2d 801, 804 (4th Cir. 1938), this court held: '* * * [T]he presumption of validity is strengthened where, as here, the principal reference urged against the patent have been considered by the Patent Office.' See also Manville Boiler Co., Inc. v. Columbia Boiler Co. of Pottstown, Inc., 269 F.2d 600, 603 (4th Cir.) certiorari denied, 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959); Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 35 F.2d 433, 437 (4th Cir. 1929), certiorari denied, 280 U.S. 609, 50 S.Ct. 158, 74 L.Ed. 652 (1930)."

Power Curbers Inc. v. E. D. Etnyre & Co., 298 F.2d 484, 493 (4th Cir. 1962)

Further, no assumption should be made that the other voluminous, newly cited art of the defendant was not considered by the Patent Examiner.

"Defendants' argument based on these prior art patents, not cited in the patent office, is not convincing. It has been held, and we think with logic, that it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked. [citing cases]."

Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 4 (7th Cir. 1953), cert. denied, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075 (1954)

See also Anderson Co. v. Sears Roebuck & Co., 265 F.2d 755, 761 (7th Cir. 1959); Davis v. Buck-Jackson Corp., 138 F.Supp. 908, 913 (E.D.S.C.1955); aff'd 230 F.2d 655 (4th Cir. 1956); and United States Pipe & Foundry Co. v. James B. Clow & Sons, Inc., 205 F.Supp. 140, 152–153 (N.D.Ala.1962).

The only other card chute feeding patent cited by the defendant, namely the Aono patent, is strikingly similar to the Penney patent and again used mechanical conveying of the opened cotton to vertical chutes and gravitational forces in the chutes. This patent, assigned on its face to Toyo Boseki Kabushiki Kaisho and Howa Kogyo Kabushiki Kaisha, commonly called "Toyobo" or "Toyobo-Howa" was licensed in the U. S. to the Saco-Lowell Corp. In spite of Saco-Lowell's thorough evaluation of the system and construction of a prototype plant, it did not achieve commercial success. In fact, defendant's witness, Mr. Still, testified that in 1966 when it was his responsibility to investigate chute feeding systems for Greenwood, the licensed Saco-Lowell system was only a proto-type installation which did not go into general commercial use. It was subsequently discontinued by Saco-Lowell as a commercial product.

The Penney and Aono patents indicate that in the period from 1928 until 1957 the only methods developed for card chute feeding were the mechanical conveying of opened cotton to the chutes and gravitational feeding of cotton through the chutes to the cards. While the Penney and Aono patents appreciated the desirability of eliminating the picker and are evidence of the long felt need and attempted solutions, neither reference taught nor appreciated the contribution of the patent in suit, namely the use of superatmospheric pressure to convey cotton to, and to control the compacting of the cotton by the air pressure differences in, vertical depositing ducts for

**1114**

card feeding. The long time period between the Penney and Aono patents and the similarity in teachings of the two clearly indicates the non-obviousness of the patent in suit.

The four patents introduced at trial in defendant's Exhibit 47 under the heading "B. Patents Showing Pneumatic Conveying of Cotton to Card Feeding Devices", (namely U. S. Patent 1,366,390 to Kronlund, issued January 25, 1921; U. S. Patent 1,629,068 to Cook, issued May 17, 1927; British Patent 160,438 to Sachsische Maschinenfabrik, issued December 1, 1921; and British Patent 24,-258 of 1914 to Burtinshaw) do not overcome the presumption of validity. They do neither individually nor collectively teach or appreciate the concept of controlled compaction by the vertical air pressure difference in a vertical depositing duct for producing a uniform batt for feeding to a card. All these patents are examples of pneumatic conveying of material from one textile machine to another. The age of the patents indicates that this concept was known for quite some time, a fact which plaintiff readily admitted. It would not be obvious to combine these references with either Penney or Aono to produce the patented combination.

At the time of the invention of the patent in suit, textile machinery manufacturers and carding machine operators were fully familiar with the use of pneumatic conveying of cotton from machine to machine. In the pneumatic conveying of opened cotton there were inherent problems and difficulties which had been experienced in the past in the textile machinery art. These known obstacles, together with the teachings of Aono and Penney, emphasizing as they did mechanical conveying and gravitational compacting, establish that the use of superatmospheric pressure in the manner of the patent in suit was objectively nonobvious to the man of ordinary skill in the art at the time of this invention.

The patents in categories C, D, E and F of defendant's Exhibit 47 all relate to the feeding of cotton gins. These are:

U.S. Patent 506,771 to Davis, issued October 17, 1893;

U.S. Patent 807,881 to Tidwell, issued December 19, 1905;

U.S. Patent 892,914 to Sullivan, issued July 7, 1908;

U.S. Patent 1,792,566 to Beaty, issued February 17, 1931;

U.S. Patent 472,607 to Murray, issued April 12, 1892;

U.S. Patent 488,446 to Murray, issued December 20, 1892;

U.S. Patent 2,156,893 to Gaus, issued May 2, 1939; and

U.S. Patent 2,320,544 to Gaus, issued June 1, 1943

In the feeding of cotton gins there is no desire to form and deliver a batt to the gins and it follows that there is no need for the formation of a uniform batt. Because these requirements are present in the chute feeding of cards and because there is neither a teaching nor an appreciation of how to satisfy these requirements in the gin art, the gin art in general, and the patents cited by the defendants in particular, do neither anticipate nor make obvious the claimed subject matter of the patent in suit.

Further, the gin machinery manufacturers traditionally did not manufacture textile or yarn manufacturing machinery. Similarly, textile machinery manufacturers did not manufacture gins. Thus, at the time of the invention, the textile equipment manufacturers, while at best generally familiar with the gin feeding art, were in no way concerned with its problems or solutions to such problems and *vice versa*.

Even if a textile machinery researcher were to look away from the textile equipment art and consider the gin machinery art, the teachings in that art do not make the invention of the patent in suit obvious. There was no appreciation in the gin art of the use of superatmospheric pressures to convey cotton in a horizontal circulating duct and to obtain the controlled compaction of cotton in a vertical depositing duct by differential

air pressure between the top and bottom of the chute for the production of a uniform batt. Thus, the gin art neither illustrates nor teaches how to achieve the results accomplished by the patent in suit.

### 3. Application of the Graham "Secondary Considerations"

█ In the *Graham* case, the Supreme Court indicated that secondary considerations such as commercial success, long felt but unsolved problems, and the attempts and failures of others to solve such problems, have relevancy as indicia of non-obviousness. The application of these considerations further strengthens the validity of the Wildbolz '477 patent.

#### a) Commercial Success

After its introduction in 1963 at the Hanover Exhibition, sales of the Aerofeed system were limited at first but they gradually grew until now the system has achieved widespread world-wide commercial success as a replacement for the prior picker/lap feeding processes.

#### b) Long Felt but Unsolved Need

Prior to the patent in suit the long existing problems of picker/lap feeding were well known, and various attempts were made to find a solution. However, no commercially acceptable solution had been found and all prior attempts were unsuccessful. The patent in suit solved these problems and satisfied a long felt need.

#### c) Failure of Others

The Penney and Aono patents were the only direct card chute feeding patents in this record. Both evidence commercially unsuccessful attempts to solve the picker/lap feeding problems.

### 4. Entry of C/MG into the Pneumatic Chute Feeding Market

C/MG entered the pneumatic chute feeding market *after* the Rieter chute feeding system had attained commercial acceptance and *after* the market had been developed. They designed their system to use *sub*atmospheric pressure for conveying the opened cotton above the chutes. After a very brief period of actual mill testing at Joanna, the C/MG system was changed to a *super*atmospheric system. As stated in Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 40 F.2d 910, 914 (4th Cir. 1930):

"And in addition to this is the presumption arising from the imitation of the patented article by the manufacturer of the alleged infringing device. As to this, we agree with what was said by Judge Hough, speaking for the Circuit Court of Appeals of the Second Circuit in Kurtz v. Belle Hat Lining Co., 280 F. 277, 281: 'The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think.'"

See also Grinnell Corp. v. American Monorail Co., *supra*, 285 F.Supp. at 230.

Based on the record before it, this Court concludes that the invention covered by the patent in suit would not have been obvious to a man of ordinary skill in the card feeding art at the time the invention was made.

### V. Infringement of the Claims in Issue

The claims of the patent in suit charged to be infringed in this case are claims 1, 5, 6, 8 and 11. Claims 1 and 11 are the independent claims with the remaining claims depending from claim 1.

Claim 1 states:

1. An automatic carding plant including cotton supply means,

 a closed cotton circulating duct having an inlet portion and an outlet portion,

 both portions being connected to said supply means, said duct forming a single closed loop between said portions and

 receiving cotton from said supply means and

returning unused cotton to said supply means

a plurality of cotton depositing ducts consecutively branching from said circulating duct,

a carding machine connected to each of said depositing ducts for receiving cotton therefrom, and,

means connected to said cotton circulating duct for circulating a gas therethrough to flow

from said inlet portion to said outlet portion and

to maintain a superatmospheric pressure in said duct at least at the locations where said depositing ducts branch from said circulating duct.

Claim 11 states:

11. An automatic carding plant including

cotton supply means,

a closed circulating duct connected to said supply means

for receiving cotton therefrom and for returning unused cotton thereto

a plurality of substantially vertical cotton depositing ducts consecutively branching from said circulating duct,

a gaseous transporting medium circulating through said circulating duct and

flowing into said depositing ducts, said medium having

a superatmospheric pressure in said depositing ducts,

a carding machine placed adjacent to the lower end of each of said depositing ducts, and

cotton discharge means located at the lower end of each of said depositing ducts

for withdrawing cotton accumulated therein and

feeding the cotton into the respective carding machine, said discharge means

forming a closure for the lower ends of the depositing ducts,

a clearance being provided between said discharge means and said depositing ducts for allowing escape of the transporting medium while retaining the cotton inside the depositing ducts and discharge means.

Claim 5 is dependent upon claim 1 and added the feature that the flow area of the circulating duct increased at the approach upstream of each connection to a depositing duct.

Claim 6 is dependent on claim 1 and added the feature that the flow area of the circulating duct adjacent to the connection of the depositing ducts is substantially rectangular and the width of the depositing ducts and the circulating duct is equal to the width of the intake of the card feeding machine.

Claim 8 is dependent on claim 5 and added the feature that the flow area of the circulating duct immediately downstream of the connection of the circulating duct to the depositing ducts is to be restricted.

Based upon the exhibits and testimony in this case, the Court finds that claims 1, 5, 6, 8 and 11 are infringed if the C/MG system is operated using superatmospheric pressures in excess of 8 mm (.31 inches) water column at the junction of any chute and the circulating duct for a line of 8 cards or less, or in excess of 10 mm (.39 inches) water column for a 10 card line, or in excess of 12 mm (.47 inches) water column in a line of 12 cards or more, and the pressure drop from the top of a chute to a point therein at or immediately above the level where the cotton column in the chute first passes through any feeding rollers, stuffing rollers or the like is more than 1.5 mm (.059 inches) water column.

With respect to claim 1, if the C/MG system operates under the conditions referred to *supra*, it is an automatic carding plant with a closed cotton circulating duct having an inlet portion and an outlet portion with both portions con-

nected to a supply means—the blender feeder, the opener and the condenser. Further, the circulating duct forms a single closed loop between the inlet and outlet portions and acts to receive and return cotton to the supply means. A plurality of cotton depositing ducts consecutively branch from the circulating duct with carding machines connected to each of the depositing ducts for receiving cotton. Finally, C/MG uses a special booster or venturi fan to circulate air through the circulating duct, to flow from the inlet to the outlet portion and to maintain superatmospheric pressure at the junctions of the depositing ducts, or chutes, and the circulating duct.

As to claim 11, it is substantially similar to claim 1 and the same analysis and comparison applies except that this claim calls for air flow in the chutes. It also requires discharge means at the lower end of the chutes to withdraw cotton from the chutes and feed it to the cards. This claim also requires a clearance in the chutes to allow escapement of the air while retaining cotton within the chutes. This Court finds that this claim is infringed if the system operates under the conditions referred to *supra*.

Claim 5 is infringed if the system operates under the conditions referred to *supra* because the flow area of the circulating duct in the C/MG systém increases at the approach and upstream of each connection of the chutes to the horizontal circulating ducts.

Claim 6 is also infringed if the system operates under the conditions referred to *supra* because in the C/MG system the flow area of the circulating duct adjacent the connections of the depositing ducts are substantially rectangular and the width of the depositing ducts are substantially the same as the width of the cards and the circulating duct.

Claim 8 is infringed if the system operates under the conditions referred to *supra* because in the C/MG system the flow area of the circulating duct is restricted immediately downstream of each connection of the circulating duct to the chutes.

## VI. *Defendant's Contentions Regarding Infringement*

On non-infringement, C/MG's main contentions were that:

a) The claims of the patent in suit are limited to feeding systems which provide for a "considerable" or "substantial" clearance for air escape at the bottom portion of the vertical ducts so that superatmospheric pressure in the horizontal circulating duct acts to produce a "substantial" downward air current which compresses and uniformly distributes the fiber in the vertical ducts. Since the C/MG chutes do not have such a construction, they do not infringe; and

b) The chutes of the C/MG system do not function in substantially the same way using substantially the same means to produce substantially the same results as the vertical depositing ducts of the feed system of the patent in suit.

In support of these contentions, C/MG urged that because of the language of the patent in suit and because of the arguments advanced during the prosecution of the application for this patent in the Patent Office, the patent claims must be limited to chutes physically similar to those illustrated in the patent. They argued that the words "considerable clearance" and "substantial clearance" found in the claims and the specification of the patent in suit require the deliberate provision of a physical clearance in the C/MG chute the same as that shown in the patent. C/MG asserted that its chute was significantly different in construction from the depositing ducts or chutes of the patent in suit and that compaction of the fibers in the C/MG chutes was accomplished by physical or mechanical means in contradistinction to the pneumatic superatmospheric pressure means of the patent in suit. Defendant emphasized the physical differences between the accused chutes and the chutes embodied in the Rieter system and illustrated in the patent in suit. They argued that seals are present in the

lower portion of the C/MG chutes to prevent air escape from the chutes and hence any upward or downward air current in these chutes.

Turning first to the argument concerning the phrase "substantial" and "considerable clearance", an examination of the patent specification and claims show that whenever the phrase "substantial" or "considerable clearance" is used, it is always described as a clearance "permit[ting] the escape of transporting medium, for example, air, but not of the cotton." ('477 patent, col. 5, lines 29–30 and claim 11). To a man of ordinary skill in the art this description in the specification and claims teaches that the clearance must only be of such magnitude as to produce an air flow in the vertical depositing ducts of sufficient magnitude to obtain the desired controlled compaction of the cotton in the chute. In practice, because this clearance must retain cotton in the vertical chute while permitting air escape, it is very small and the amount of air flow is minimal. This Court observed that the Rieter Aerofeed chutes as installed at the Judson Mill control compaction with such a minimal amount of air flow through the chutes.

Although the C/MG's chutes are not designed with a deliberate clearance at or near the bottoms thereof for escape of air and are, in fact, equipped with seals to minimize such air escape, the Court finds that the C/MG system infringes Claims 1, 5, 6, 8 and 11 of the patent in suit if the system utilizes superatmospheric pressure at least in excess of 8 mm (.31 inches) water column. By various tests conducted using a representative C/MG chute it was shown that above certain atmospheric pressure levels there was air leakage through the chute and that the weight of the material fed to the card increased with increasing superatmospheric pressure and decreased with decreasing superatmospheric pressure. Thus Defendant's contention regarding the "physical" dissimilarities of their chutes does not support a finding

that the claims of the patent are not infringed.

 As stated by the Sixth Circuit Court of Appeals in Maxon v. Maxon Constr. Co., 395 F.2d 330, 334–335 (6th Cir. 1968):

"While the specification and drawings of Maxon's patent do describe and illustrate a rear dump body, Claim 15 contains no such limitation. The claims of a patent are not necessarily limited to the embodiment depicted in the patent. [citing cases].

"A patentee is only required to describe the best method of practicing his invention but he is not confined to that. If his claim is broad enough, he may claim infringement 'if another uses the principle and appropriates the substance of his invention.' [citing cases]. His claims are the measure of his invention. . . .

"One may not avoid infringement by a mere change in the position of an operable element when the operation and results achieved by the accused device are essentially the same as the patented device. [citing case]."

The Tenth Circuit Court of Appeals has stated:

"It is enough if the invention be described together with that mode which is conceived to be the best for putting it into practical use; and where that has been done, the patent is not confined to the precise mode outlined." Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F.2d 945, 946 (10th Cir. 1938).

See also Cameron Iron Works, Inc. v. Stekoll, 242 F.2d 17, 20 (5th Cir. 1957); and King-Seeley Thermos Co. v. Tastee Freez Industries, 357 F.2d 875, 880 (7th Cir. 1966), cert. denied, 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966).

 The substance of the invention is embodied in the C/MG system when the system is operated in excess of certain superatmospheric pressures. The additional mechanical elements in the C/MG chute do not avoid the patent

claims. In this regard, the generic law is:

"One cannot avoid infringement by an addition to a patent even though the addition is important to the use intended for the resulting article [citing authority]." Marston v. J. C. Penney Co., Inc., 353 F.2d 976, 985 (4th Cir. 1965), cert. denied, 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966).

A Fourth Circuit case which involved a somewhat related factual situation and follows this well-established law is Matthews v. Allen, 182 F.2d 824, 827–828 (4th Cir. 1950), where the Court stated:

"In this connection the contention is made that Exhibit 20 does not infringe because the air is not allowed 'to escape freely throughout the whole of the area of the awnings,' a phrase found in the specifications but not in the claims of the patent. Obviously this argument cannot prevail for even if the quoted language should be considered a limitation upon the claims, infringement would not be avoided since the structure would still enable the infringer to embody the heart of the invention although it might be done somewhat imperfectly. The variations between the awnings of the defendants and the awnings of the patent, whether the standard or 'jammed lug' type be considered, must be examined under the well established rule that one does not avoid infringement by following the teachings of a patent imperfectly or by constructing a device that does not function as well as the patented structure, so long as he appropriates the substance of the invention. [citing cases]."

In a more recent case within the Fourth Circuit, it was stated:

"The inventive ideas of plaintiff have been appropriated; supplementation or modifications, even if an improvement, will not avoid infringement. [citing cases]. 'If the infringing device performs the same func-

tion as the patented device, it is immaterial that it also performs some other function. It is still * * * an appropriation of the patented invention.' Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir. 1939, 95 F.2d 801, 804."

Ransburg Electro-Coating Corp. v. Proctor Electric Co., 203 F.Supp. 235, 258 (D.Md.1962), aff'd 317 F.2d 302 (4 Cir. 1963).

In still another case, this law is followed, along with the additional point that the intentions of the infringing party are not material:

"Further, defendants to avoid the calls of the claims of plaintiff's patent may have followed its teachings imperfectly or not exactly. Or they may have built a device that does not function in exactly the same way or as well as the patented structure. But it is a well established rule that this will not suffice so long as the substance of the invention is appropriated by the accused device. [citing cases]. And whether defendants had any intention to infringe plaintiff's patent is immaterial. [citing cases]."

Abbott v. Barrentine Mfg. Co., 255 F. Supp. 890, 899 (N.D.Miss.1966).

The foregoing quotations are particularly applicable to the infringement issues before this Court where it was proven that the invention of the patent in suit did not simply improve existing equipment but, rather, took a different route to produce a basic and pioneering solution of a long existing problem. In such a case, the patent should be accorded a liberal interpretation. This question was considered at an early date in Morley Sewing-Machine Co. v. Lancaster, 129 U.S. 263, 273, 9 S.Ct. 299, 302, 32 L.Ed. 715 (1889), where the Court stated:

"No machine existing prior to Morley's is shown to have accomplished that operation * * * *

"Morley, having been the first person who succeeded in producing an automatic machine for sewing buttons

of the kind in question upon fabrics, is entitled to a liberal construction of the claims of his patent. He was not a mere improver upon a prior machine, which was capable of accomplishing the same general result; in which case his claims would properly receive a narrower interpretation. This principle is well settled in the patent law, both in this country and in England."

See also Kokomo Fence Machine Co. v. Kitselman et al., 189 U.S. 8, 23 S.Ct. 521, 47 L.Ed. 689 (1903).

VIII. *Conclusion*

 In accordance with the foregoing findings and conclusions it is:

Ordered, Adjudged and Decreed as Follows:

That the Wildbolz, et al. U.S. Letters Patent 3,029,477 is valid and that claims 1, 5, 6, 8 and 11 are infringed if the C/MG system is operated with a superatmospheric (positive) static pressure at the top of any chute greater than:

i) 8 mm (.31 inches) water column in a line or system of 8 cards or less;

ii) 10 mm (.39 inches) water column in a line or system of 10 cards; and

iii) 12 mm (.47 inches) water column in a line or system of 12 cards, or more;

AND

the pressure drop from the top of a chute to a point in a chute at or immediately above the level where the cotton column in the chute first passes through any stuffing rollers, feeding rollers or other restrictive means is more than 1.5 mm (.059 inches) water column.

That pursuant to agreement of the parties, Rieter has agreed to grant to Greenwood Mills and to Jackson Mills either a paid up license or a release for one dollar with respect to the C/MG chute feeding system installed prior to December, 1971 including 6 lines each having 8 chutes at the Joanna Mill of Greenwood Mills and 1 line having 6 chutes at the Welford Mill of Jackson Mills, and it is further ordered that such paid up license or release be granted.

That each party shall bear its own costs including attorneys' fees.

That defendants' counterclaims are hereby dismissed.

This written Order shall constitute this Court's Findings of Fact and Conclusions of Law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.